# United States Court of Appeals

## For the First Circuit

No. 04-2079

EFRAT UNGAR ET AL.,
Plaintiffs, Appellees,

v.

THE PALESTINE LIBERATION ORGANIZATION ET AL.,
Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell, Senior Circuit Judge,

and Lipez, Circuit Judge.

Ramsey Clark, with whom Lawrence W. Schilling, Deming E. Sherman, and Edwards & Angell, LLP were on brief, for appellants.
David J. Strachman, with whom McIntyre, Tate, Lynch & Holt was on brief, for appellees.
Daniel J. Popeo, Richard A. Samp, Joel J. Sprayregen, and Jared M. Wayne on consolidated brief for Washington Legal Foundation and Allied Educational Foundation, amici curiae.

March 31, 2005

**SELYA**, **Circuit Judge**. This appeal raises exceptionally important questions of justiciability and sovereignty, emblematic of unsettled political conditions that have plagued the Middle East for many years. In it, the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) ask us to countermand the district court's refusal to dismiss the action against them. They contend that the case hinges on a nonjusticiable political question and that, at any rate, the defendants enjoy sovereign immunity. In the event that these arguments do not carry the day, the defendants seek vacation of two $116,000,000-plus default judgments, one entered against each of them, on the ground that they were entitled to a binding determination of sovereign immunity (including appellate review of any unfavorable decision) before being forced to bear the burdens of litigation.

After careful consideration of the relevant legal authorities and perscrutation of an amplitudinous record, we conclude that this case is justiciable; that the defendants have not established an entitlement to sovereign immunity; and that the defendants' strategic litigation choices undercut their arguments as to the sequencing of the litigation. Consequently, we affirm the judgment below.

## I. BACKGROUND

This case had its genesis in a terrorist attack that occurred in Israel on June 9, 1996. On that date, Yaron Ungar (a

citizen of the United States), his wife Efrat, and their infant son Yishai were driving home from a wedding. Near Beit Shemesh, a car approached the Ungars' vehicle and loosed a salvo of machine-gun fire, killing both Yaron and Efrat. The three occupants of the attacking vehicle were all members of the Hamas Islamic Resistance Movement (Hamas), a group designated as a terrorist organization by the United States Department of State. See 8 U.S.C. § 1189; Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 56,860, 56,861 (Oct. 2, 2003). The authorities apprehended the three assailants and, soon after, arrested a fourth Hamas member as an accessory. An Israeli court convicted all four men.

David Strachman was appointed as the administrator of the estates of Yaron and Efrat Ungar. On March 13, 2000, Strachman and other plaintiffs filed suit in the United States District Court for the District of Rhode Island pursuant to the Anti-Terrorism Act (ATA), 18 U.S.C. §§ 2331-2338. That statute provides a cause of action in favor of any "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." Id. § 2333(a). Venue for such an action may be laid in, inter alia, "any district where any plaintiff resides," id. § 2334(a), and the plaintiff(s) may recover treble damages, costs, and attorneys' fees, id. § 2333(a).

-3-

The original complaint set forth both ATA and state law claims. It was brought by numerous plaintiffs against numerous defendants. We need not call the roll; for all practical purposes, the case boils down to a suit involving the estate and heirs of Yaron Ungar as plaintiffs and the PA and the PLO as defendants.[1] The centerpiece of the complaint was an allegation that the defendants had engaged in international terrorism within the purview of the ATA. See id. § 2331(1).

On an ensuing motion to dismiss, the district court rejected an assertion that the PA and the PLO were immune from service of process. Estates of Ungar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 90-91 (D.R.I. 2001) (Ungar I). However, the court dismissed the state law claims, finding that Rhode Island choice-of-law principles favored the application of Israeli law. Id. at 98-99.

The plaintiffs served an amended complaint on August 23, 2001, asserting one claim under the ATA and three Israeli law claims, all on behalf of the estate and heirs of Yaron Ungar. The

---

[1]On the plaintiffs' side, the claims brought by the estate and heirs of Efrat Ungar were dismissed because she was not a United States national. Estates of Ungar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 97 (D.R.I. 2001). On the defendants' side, a number of Hamas defendants were sued, but none of them entered an appearance and, accordingly, the district court defaulted them. See id. at 85 n.2. The court dismissed the action as to several other defendants for want of in personam jurisdiction. Id. at 95. For present purposes, then, it simplifies matters to think of this case as a suit by Yaron Ungar's estate and heirs against the PA and the PLO.

PA and the PLO moved to dismiss the amended complaint on essentially the same grounds as previously urged, adding only that the claims were nonjusticiable.  Alternatively, they sought to have the district court certify, pursuant to 28 U.S.C. § 1292(b),[2] various questions, including a question as to whether the defendants were entitled to a non-specific "functional" immunity "arising from the peculiar status of the PA as a functioning governmental entity."  At that point, the defendants were not claiming statehood; they argued only that the policy considerations underlying the ATA's recognition of immunity for foreign states "appl[ied] equally" to them.

The PA and the PLO later changed their position.  On January 30, 2002 — during the pendency of their motion to dismiss the amended complaint — they jointly moved for "leave to assert defenses."  In the memorandum accompanying that motion, they for the first time claimed an immunity from suit based on sovereignty.

_____

[2]This statute provides in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable . . ., shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals . . . may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b).

They explained that they initially had chosen not to seek immunity on the basis of statehood and suggested that emergent political events in their region had caused a change of plan. The motion for leave to assert defenses was a curiosity — the defendants had not yet answered the amended complaint and were free to assert, by motion to dismiss or otherwise, any colorable defense — and the district court never acted on it.

In the same time frame, the defendants moved for a stay of discovery and the plaintiffs moved for an order compelling discovery. The court granted the requested stay pending resolution of the motion to dismiss the amended complaint. On November 4, 2002, the district court denied the dismissal motion and dissolved the stay. The court flatly rejected the claim of nonjusticiability. Estates of Ungar ex rel. Strachman v. Palestinian Auth., 228 F. Supp. 2d 40, 44-47 (D.R.I. 2002) (Ungar II). It also determined that the amended complaint stated claims upon which relief could be granted both under the ATA and under Israeli law. Id. at 47-48. Finally, the court reiterated its earlier rejection of the defendants' claim of immunity from service of process and added that the PA, as a governmental entity, was not a sovereign state immune from suit under the ATA. Id. at 48-49. Finally, the court declined the defendants' invitation to certify questions for interlocutory review. Id. at 49-51 (citing

Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47-49 (2d Cir. 1991)).

The PA and the PLO moved for reconsideration and again asked for a stay. Some two months later, the district court granted the plaintiffs' outstanding motion to compel discovery, giving the defendants additional time to respond due to their overseas location. The defendants nonetheless moved for reconsideration of the discovery order and submitted a letter from Palestine's permanent observer at the United Nations, which stated that the defendants could not be expected to respond to discovery due to the unremitting violence in the region. The letter suggested that the defendants should be allowed to wait until there was a final decision on the jurisdictional question before being forced to attend to the discovery requests.

On February 7, 2003, the plaintiffs moved for an entry of default based on the defendants' failure to answer the amended complaint. Six weeks later, the district court denied the defendants' pending motion to reconsider the order compelling discovery. On April 11, the court held a hearing on the defendants' outstanding motion to reconsider its decision in Ungar II. The court indicated from the bench that it would deny both that motion and the concomitant request for a stay, but it did not actually enter such an order until April 22, 2003. Meanwhile, a magistrate judge entered the requested default, concluding that the

defendants' failure to answer the amended complaint and their refusal to participate in discovery were the result of a deliberate strategic choice. The default was posted on the docket on April 21, 2003.

The defendants filed a notice of appeal to this court on April 23, 2003, in which they sought interlocutory review of both the lower court's decision in Ungar II and that court's refusal to reconsider that decision. They averred that they had been deprived of the opportunity to make a showing of sovereign immunity because the district court failed to take action on their motion for leave to assert a sovereign immunity defense, yet proceeded to determine that the defendants had no entitlement to immunity. We summarily affirmed the orders appealed from, noting that the defendants had neither moved to dismiss on the ground of sovereign immunity nor attempted, in the lower court, to make the evidentiary showing required to sustain such a defense. Ungar v. Palestinian Liberation Org., No. 03-1544, 2003 WL 21254790, at *1 (1st Cir. May 27, 2003) (per curiam) (unpublished). We added that the defendants' motion for leave to assert a defense was wholly gratuitous, as they did not need the court's permission to raise the sovereign immunity issue at that stage of the case. See id.

We issued our order without prejudice to the defendants' future efforts to press their newly asserted sovereign immunity defense in an appropriate fashion. See id. (admonishing that the

defendants "must adhere to the rules that govern all litigants"). The next pleading, however, came from the plaintiffs, who moved for a default judgment. The defendants responded by filing their third motion to dismiss. This time, they predicated the motion on three bases, namely, (i) that the case centered around nonjusticiable political questions; (ii) that the defendants were entitled to sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611; and (iii) that section 2337(2) of the ATA, which provides that a suit under section 2333 may not be maintained against "a foreign state [or] an agency of a foreign state," independently divested the district court of jurisdiction.

The parties were like ships passing in the night. Pursuing the plaintiffs' path, the magistrate judge, on March 31, 2004, recommended the entry of default judgments against the PA and the PLO in amounts exceeding $116,000,000.[3] The defendants interposed timely objections to the report and recommendation, reasserting their nonjusticiability and sovereign immunity points and contending, for the first time, that they were entitled to a final determination on sovereign immunity (including appellate review) before being required either to answer the complaint or to submit to discovery.

---

[3]The amounts differed slightly. The recommended judgment against the PA was for $116,421,048 and the recommended judgment against the PLO was for $116,415,468. The reasons for this minor disparity are not material to the issues on appeal.

Meanwhile, the district court had been pursuing the course charted by the defendants. On April 23, 2004, it denied the defendants' renewed motion to dismiss the amended complaint. Estates of Ungar v. Palestinian Auth., 315 F. Supp. 2d 164, 187 (D.R.I. 2004) (Ungar III). The court hewed to its earlier rejection of the defendants' nonjusticiability thesis. See id. at 173-74 (referencing Ungar II, 228 F. Supp. 2d at 44-47). Next, the court held that the FSIA and section 2337(2) of the ATA were two sides of the same coin with respect to sovereign immunity. Id. at 174-75. This left only a single question: "whether the PA and/or the PLO represent or constitute a foreign State and are thus entitled to sovereign immunity." Id. at 175. The court answered that question in the negative. Id. at 176-87. The plaintiffs immediately moved to amend the court's order pursuant to Fed. R. Civ. P. 59(e), arguing that the sovereign immunity defense had been waived. The defendants did nothing.

On July 12, 2004, the district court went down the plaintiffs' path. It adopted the magistrate judge's "default judgment" report and recommendation in its totality, overruled the defendants' objections thereto, and denied the plaintiffs' motion to amend Ungar III. See Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Auth., 325 F. Supp. 2d 15, 21-22, 26-28 (D.R.I. 2004) (Ungar IV). In the course of that decision, the court rebuffed the defendants' claim that they were entitled to a full

review of their sovereign immunity defense before being required to answer the complaint or proceed further.  Id. at 23-24.  The court then ordered judgment for the plaintiffs in the recommended amounts.  Id. at 28.  This appeal ensued.

## II.  JUSTICIABILITY

The defendants maintain that the complaint against them should have been dismissed because it presents a non-justiciable political question.  We find this argument unconvincing.

In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court provided guidance as to the attributes of a nonjusticiable political question.  The Court explained that "it is the relationship between the judiciary and the coordinate branches of the Federal Government . . . which gives rise to the 'political question.'"  Id. at 210.  Withal, not "every case or controversy which touches foreign relations lies beyond judicial cognizance."  Id. at 211.  Determining justiciability requires an "analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action."  Id. at 211-12.  The Court then set forth six tests designed to confirm or negate the existence of a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate

-11-

political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217. The Court explained, in a later case, that "[t]hese tests are probably listed in descending order of both importance and certainty." Vieth v. Jubelirer, 124 S. Ct. 1769, 1776 (2004).

The defendants assert with little elaboration that the central issue in this case fails each of the six tests. Most of their argumentation presumes that the district court intruded into forbidden territory when it interpreted an array of United Nations resolutions and Israeli-PLO agreements in a politically controversial manner. To this they add that the default judgment entered by the district court was so huge that it amounted to a political statement.

The defendants' position rests on a misunderstanding of the fundamental nature of this action. This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism. The defendants are

-12-

organizations that allegedly violated the statute. They have attempted to avoid liability by wrapping themselves in the cloak of sovereign immunity. The question we must answer, then, is whether the defendants have set forth sufficient evidence to support their claim of immunity — no more and no less.

On this view of the case, the plaintiffs easily clear the six Baker hurdles. To begin, the lower court's immunity decision neither signaled an official position on behalf of the United States with respect to the political recognition of Palestine nor amounted to the usurpation of a power committed to some other branch of government. After all, Congress enacted the ATA, and the President signed it. The very purpose of the law is to allow the courts to determine questions of sovereign immunity under a legal, as opposed to a political, regime.[4] Seen in this light, the district court's decision denying immunity did not impede the constitutional prerogatives of the political branches over foreign policy. See generally Baker, 369 U.S. at 211 & n.31 (noting that

_____

[4]The FSIA operates in the same fashion. See 28 U.S.C. § 1602 ("The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts."); H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606 ("A principle purpose of [the FSIA] is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds . . . .").

the Constitution commits foreign relations to the executive and legislative branches, thus permitting them to determine what "may be done in the exercise of this political power").

The second and third Baker hurdles present no insuperable obstacles here. The district court had access to judicially manageable standards for resolving the issue before it, see infra Part III(A), and those standards did not require the court to make nonjudicial policy determinations. Both sides agreed that the definition of a "state" under the relevant statutes was informed by an objective test rooted in international law and articulated in the Restatement (Third) of Foreign Relations. Under these circumstances, the determination of whether the defendants have adduced sufficient evidence to satisfy that definition is quintessentially appropriate for a judicial body. See Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir. 1995)

The final three hurdles need not concern us. These tests are "relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." Id. Here, the political branches have enacted a law that leaves undiminished their ability either to recognize or withhold recognition from foreign states, while leaving to the courts the responsibility of determining the existence vel non of statehood for jurisdictional purposes.

-14-

Moreover, the district court's resolution of that question is not incompatible with any formal position thus far taken by the political branches. By the same token, its jurisdictional decision does not turn a blind eye to any position expressed by those responsible for conducting the nation's foreign relations. Cf. Republic of Austria v. Altmann, 124 S. Ct. 2240, 2255 (2004) (noting that the State Department has retained authority to file "statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity"). As a result, the decision did not signify a lack of respect for, or conflict with, the wishes of the political branches. No more is exigible for this purpose. See Baker, 369 U.S. at 212-13 (endorsing judicial competence in matters touching on foreign relations in the absence of any "conclusive governmental action" or "recognizedly authoritative executive declaration") (citation and internal quotation marks omitted).

The defendants make a number of specific arguments, but these are largely derivative of their disagreement with the result reached by the district court. Their unhappiness is understandable, but legally irrelevant. The reality is that, in these tempestuous times, any decision of a United States court on matters relating to the Israeli-Palestinian conflict will engender strong feelings. Be that as it may, the capacity to stir emotions is not enough to render an issue nonjusticiable. For

-15-

jurisdictional purposes, courts must be careful to distinguish between political questions and cases having political overtones. See Klinghoffer, 937 F.2d at 49.

The one remaining argument that warrants particularized attention is the defendants' assertion that the district court made a political statement in calibrating the size of the award. That assertion is wholly unsupported. The judgment reflects the wrongful death of a youthful man and includes a trebling of damages as mandated by law. See 18 U.S.C. § 2333(a). It also includes attorneys' fees. See id. The defendants have not challenged either the measure of damages utilized by the lower court or the integrity of its mathematical computations. We add, moreover, that even if the court erred on the side of generosity — a matter on which we take no view — a mere error in the calculation of a damages award would not implicate the propriety of federal subject matter jurisdiction. We therefore reject the defendants' "political statement" assertion as meritless.

To say more on this aspect of the case would be supererogatory. The short of it is that the political question doctrine does not preclude judicial resolution of the plaintiffs' case. We turn, therefore, to the merits of the sovereign immunity defense.

## III.  SOVEREIGN IMMUNITY

We divide our discussion of the defendants' sovereign immunity defense into segments, starting with the legal framework and historical background.  We then proceed to the merits.

### A.  **The Legal Landscape**.

The FSIA, with exceptions not relevant here, provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States."  28 U.S.C. § 1604.  Although the statute does not define the term "foreign state," it makes pellucid that the term includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  Id. § 1603 (a).  It also defines what constitutes an agency or instrumentality of a foreign state.  Id. § 1603(b).

The ATA contains analogous language.  It provides that no civil action thereunder may be maintained against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority."  18 U.S.C. § 2337(2).  Like the FSIA, the ATA contains no definition of the term "foreign state."

Because the two statutory regimes use language that is similar but not identical, the first — and most obvious — question is whether there are substantive differences in the meaning of the term "foreign state" as used in the FSIA and the ATA, respectively.

-17-

The district court concluded that the two statutes were to be read in pari materia. See Ungar III, 315 F. Supp. 2d at 175. We agree with that conclusion.

We recognize, of course, that even identical terms can have divergent meanings when used in different statutes. See, e.g., Hanover Ins. Co. v. United States, 880 F.2d 1503, 1504 (1st Cir. 1989); United States v. Sterling Nat. Bank & Trust Co., 494 F.2d 919, 923 (2d Cir. 1974). Generally speaking, however, that phenomenon occurs only when the purpose, history, and structure of the statutes make manifest a principled basis for interpreting the words differently. See, e.g., Perez-Arellano v. Smith, 279 F.3d 791, 794 (9th Cir. 2002). Here, however, the Supreme Court has observed that "the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Nothing in either the language or legislative history of the ATA gives any indication that Congress intended the newer statute to supercede, rather than to mirror, the detailed jurisdictional framework described in the FSIA. To cinch matters, the Supreme Court, in a post-ATA case, recently repeated its admonition that "courts should decide claims of sovereign immunity in conformity with the [FSIA's] principles." Altmann, 124 S. Ct. at 2249. Consequently, we regard an assertion of sovereign immunity under

-18-

the ATA, 18 U.S.C. § 2337(2), as being functionally equivalent to an assertion of sovereign immunity under the FSIA, 28 U.S.C. § 1604.

This brings a second question into focus. Since neither the FSIA nor the ATA define the term "foreign state" as it relates to a sovereign power, we must determine the intended meaning of that term. There is no controlling precedent in this circuit as to the essential attributes of statehood in this context. The parties, however, find common ground in their shared conviction that the definition should be derived by application of the standard set forth in the Restatement (Third) of Foreign Relations. This standard deems a state to be "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) of Foreign Relations § 201 (1987). Under the Restatement standard, political recognition — typically thought of as "a formal acknowledgment by a nation that another entity possesses the qualifications for nationhood," N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc., 954 F.2d 847, 853 (2d Cir. 1992) — is not a prerequisite to a finding of statehood. See Restatement (Third) of Foreign Relations § 202 cmt. b (explaining that "[a]n entity that satisfies the requirements of § 201 is a state whether or not its statehood is formally recognized by other states").

Using the Restatement standard as the rule of decision is a colorable position. In this regard, the Restatement tracks the historical standard found in international law. See Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 553 (2d Cir. 1988); see also Convention on Rights and Duties of States (Montevideo Convention), Dec. 26, 1933, art. 1, 49 Stat. 3097, 3100, 165 L.N.T.S. 19, 25.[5] In addition, the FSIA's legislative history is itself replete with congressional references to sovereign immunity's roots in international law. See, e.g., H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 (noting that the objective of the bill was to codify sovereign immunity doctrine as recognized by international law and to ensure that this international standard would be applied in federal litigation). The legislative history goes on to recount that the very foundation of foreign sovereign immunity in federal jurisprudence rests on the Supreme Court's recognition of that doctrine in The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116 (1812). There, the Court established that the federal courts generally have no jurisdiction over suits involving foreign sovereigns with whom the United States is at peace, deriving such an immunity from the custom and practice of international law. Id. at 135-46.

---

[5]The Montevideo Convention is still in effect and the United States is a party to it. See United States Dep't of State, Treaties in Force 480 (2004).

Over time, the federal courts came to rely less on international law and more on the actions of the State Department in determining whether to grant immunity in individual cases. H.R. Rep. No. 94-1487, at 8, reprinted in 1976 U.S.C.C.A.N. at 6606. The committee report that accompanied the FSIA noted that this practice was generally at odds with the views of the international community; indeed, in "virtually every country . . . sovereign immunity is a question of international law to be determined by the courts." Id. at 9, reprinted in 1976 U.S.C.C.A.N. at 6607-08. To that end, Congress endeavored to bring the United States back into conformity with the world community by taking immunity decisions out of the hands of the executive branch and depositing them in the judicial branch. Id. at 12, reprinted in 1976 U.S.C.C.A.N. at 6610. The committee report unequivocally restates the "central premise of the bill" as being that "decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law." Id. at 14, reprinted in 1976 U.S.C.C.A.N. at 6613 (emphasis supplied).

This legislative history offers strong support for the proposition that courts should look to international law to determine statehood for purposes of the FSIA. The case law that has evolved in the lower federal courts, while scanty, pushes in the same direction. See, e.g., Morgan Guar. Trust Co. v. Republic

of Palau, 924 F.2d 1237, 1243-47 (2d Cir. 1991) (using Restatement standard to determine whether Palau qualified as a foreign state); Klinghoffer, 937 F.2d at 47-49 (same with respect to PLO). Consequently, for purposes of this case, we accept the parties' agreement that the Restatement standard controls the statehood question.[6]

## B. The Historical Background.

Following World War I, the League of Nations placed the region of Palestine, formerly a part of the Ottoman Empire, under a mandate. The mandate system grew out of the idea that some former colonies of nations defeated in World War I were "not yet able to stand by themselves" and should be placed under the tutelage of "advanced nations." League of Nations Covenant art. 22, paras. 1, 2. Palestine was among those territories deemed to "have reached a stage of development where their existence as

---

[6]We caution that the Restatement standard, though embraced by both sides in this case, is not inevitably correct. It may be argued that a foreign state, for purposes of the FSIA, is an entity that has been recognized as a sovereign by the United States government. See, e.g., Ungar III, 315 F. Supp. 2d at 186-87 (alternate holding); cf. 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 3604 (2d ed. 1984) (noting that for purposes of former 28 U.S.C. § 1332(a)(2)(1970) — a statute modified by the FSIA — federal courts generally had held that a foreign state was one that had been recognized as such by the United States government, in either a de jure or de facto capacity (collecting cases)). Here, however, all roads lead to Rome. The defendants' sovereign immunity defense fails the Restatement test. See infra Part III(C). If recognition were the test, the result would be the same. After all, the United States has not recognized Palestine as a sovereign nation. Thus, we need not probe the point too deeply.

-22-

independent nations [could] be provisionally recognized," subject to "administrative advice and assistance" from more mature governments. Id. at para. 4. The United Kingdom held the mandate over Palestine. Rather than "advice and assistance," however, the powers conferred were more akin to rule. Subject to implicit limitations not relevant here, the mandate gave the United Kingdom "full powers of legislation and of administration" over the region, as well as "control of the foreign relations of Palestine." Mandate for Palestine arts. 1, 12, League of Nations Doc. C.529 M.314 1922 VI (1922). The mandate also made the United Kingdom responsible for "placing [Palestine] under such political, administrative and economic conditions as will secure the establishment of the Jewish national home." Id. art. 2.

Heavy Jewish immigration to the region followed, owing in large part to the persecution of Jews in Europe. Tension between the Jewish and Arab populations led to violence and civil unrest. See United Nations Dep't of Pub. Info., The Question of Palestine & The United Nations at 3, U.N. Doc. DPI/2276, U.N. Sales No. 04.I.15 (2003) (Question of Palestine). By 1947, the United Kingdom's patience had worn thin. It took steps to divest itself of the mandate and dump the problem into the lap of the United Nations. Id.

The United Nations rose to the occasion. It formulated a plan that involved the creation of two independent states within

-23-

the mandate territory: one Jewish, the other Arab. This plan also purposed to make Jerusalem an international enclave administered by the United Nations. See Future Gov't of Palestine, G.A. Res. 181(II), U.N. GAOR, 2d Sess., at 131, U.N. Doc. A/519 (1947). The plan delineated the boundaries of the two states and the Jerusalem enclave, id. at 142-46; established a timetable for the withdrawal of British forces; and proposed to end the existing mandate no later than August 1, 1948. Id. at 132-33. As the British withdrew, power would temporarily vest in a United Nations commission pending the establishment of provisional governments by each of the two putative states. Id. at 133. At that point, the provisional governments would "progressively receive" full administrative responsibility. Id. at 134. When the independence of a state had "become effective," that state would be accorded "sympathetic consideration" for admission to the United Nations. Id. at 142.

The plan never took effect. Although Jewish leaders accepted it, Palestinian leaders did not. See Question of Palestine at 10. The Palestinians, still representing two-thirds of the population of the affected territory, argued vociferously against partition. Id. at 7, 10. Faced with a steadily deteriorating situation, the British abandoned the mandate and withdrew from the region. Id. at 11. On the same date — May 14, 1948 — Jewish leaders announced the establishment of the State of

Israel, using the territorial boundaries delineated in G.A. Res. 181(II) to demarcate its borders.  Id.

The next day, armed forces of the surrounding Arab states entered the former mandate territory.  Id.  The Arab League notified the U.N.'s Secretary-General that they intended to fill the vacuum left by the abrupt departure of the British forces and to restore law and order in the region.  See United Nations, The Origins and Evolution of the Palestine Problem 137-38 (1990).

The Arab invasion precipitated the first Arab-Israeli war.  Question of Palestine at 11.  During the conflict, nearly three-quarters of a million Palestinian refugees fled Israeli-controlled territory.  Id. at 81.  By the time of the eventual armistice, Egypt had taken control of the Gaza Strip, Jordan was in control of the West Bank (including East Jerusalem), and Israel had taken control of the remainder of the former mandate territory. Id. at 12.

This division persisted until 1967, when war again broke out between Israel, on the one hand, and Egypt, Jordan, and Syria, on the other hand.  Id. at 18.  Israel prevailed.  Its spoils included occupation of the Gaza Strip and the West Bank, as well as the Sinai peninsula (previously under Egyptian rule) and the Golan Heights region of Syria.  Id.

The U.N.'s Security Council attempted to undo these gains by diplomatic means.  It issued a resolution that called for the

"[w]ithdrawal of Israeli armed forces from territories occupied in the recent conflict" and beseeched the protagonists to respect and acknowledge "the sovereignty, territorial integrity and political independence of every State in the area."  S.C. Res. 242, U.N. SCOR, 22d Sess., Resolutions and Decisions, at 8, U.N. Doc. S/INF/22/Rev.2 (1967).  The document did not directly address the question of Palestine.  The PLO, which had been formed in 1964, strongly criticized the resolution for that reason.  Question of Palestine at 19.

In 1968, the PLO declared that the international community had failed to secure the rights of Palestinian Arabs and vowed to take up the struggle.  Id. at 31.  In 1973, a third Arab-Israeli war led the Security Council to renew its call for implementation of the terms of Resolution 242.  See S.C. Res. 338, U.N. SCOR, 28th Sess., Resolutions and Decisions, at 10, U.N. Doc. S/INF/29 (1973).  The following year, the United Nations General Assembly adopted two resolutions:  one affirming the rights of Palestinians to "self-determination without external interference" and to "national independence, and sovereignty," and the other granting the PLO observer status at the United Nations.  G.A. Res. 3236 & 3237, U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974).

Over the next decade, the PLO provided municipal services to Palestinians in the West Bank and other refugee-dominated areas.

By the early 1980s, these activities had put into place "an extensive rival bureaucratic structure." 25 Encyclopaedia Britannica 423 (15th ed. 2003). PLO attacks against Israel grew in intensity, eventually leading to Israel's invasion of Lebanon and the expulsion of a large PLO contingent. Question of Palestine at 26-28.

On July 31, 1988, Jordan gave up its claims to the West Bank. See Jordan: Statement Concerning Disengagement from the West Bank and Palestinian Self-Determination, 27 I.L.M. 1637 (1988). Within a few weeks thereafter, the PLO, speaking from exile in Algeria, issued a "Declaration of Independence" that proclaimed the "establishment of the State of Palestine in the land of Palestine with its capital at Jerusalem." Palestine Nat'l Council: Political Communique & Decl. of Indep., 27 I.L.M. 1660, 1670 (1988). In response, the United Nations decided to use the term "Palestine" instead of "Palestine Liberation Organization" within the United Nations system, but expressly stated that this redesignation did not enhance the group's observer status. G.A. Res. 43/177, U.N. GAOR, 43d Sess., Supp. No. 49, at 62, U.N. Doc. A/43/49 (1988).

In 1993, the United States helped to broker the first agreement between Israel and the PLO. Under its terms, Israel accepted the PLO as the representative of the Palestinian people and the PLO acknowledged Israel's statehood. Question of Palestine

at 47. This rapprochement culminated in the signing of the first of the Oslo Accords: the Declaration of Principles on Interim Self-Government Arrangements (DOP), Sept. 19, 1993, Isr.-P.L.O., 32 I.L.M. 1525. The DOP's stated purposes included the establishment of a Palestinian interim self-governing authority (the PA) as a precursor to a permanent arrangement based on Security Council Resolutions 242 and 338. Id. art. I, 32 I.L.M. at 1527. The DOP treated the West Bank and the Gaza Strip as a single territorial unit and stated that, when certain conditions had been achieved, Israel would transfer authority over "education and culture, health, social welfare, direct taxation, and tourism" in those areas to the PA. Id. art. VI, 32 I.L.M. at 1529. The DOP also set forth a framework for negotiating the structure of the PA. Id. art. VII, 32 I.L.M. at 1530-31. And, it specified that while the PA, when created, would be responsible for self-policing, Israel would remain responsible for external security (including the overall safety of Israelis), in the affected territory. Id. art. VIII, 32 I.L.M. at 1531.

The protagonists reached agreement as to the structure of the PA in 1994, and the PA then became a reality. See Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, Isr.-PLO, art. IV, 33 I.L.M. 622, 628. On September 28, 1995, Israel and the PLO signed the interim agreement called for in the DOP, aspiring to reach a permanent agreement within five years. See Interim

-28-

Agreement on the West Bank & the Gaza Strip, Sept. 28, 1995, Isr.-P.L.O., pmbl., 36 I.L.M. 551, 558. The interim agreement enumerated those powers and responsibilities to be transferred to the PA. For example, it granted executive responsibility to the PA with respect to "all matters within its jurisdiction," including the formulation of policies, the issuance of rules and regulations, and the making of contracts. <u>Id.</u> art. IX, 36 I.L.M. at 560-61. The PA was, however, denied authority over foreign relations, including the establishment of embassies, the hiring of diplomatic staff, and the exercise of diplomatic functions.[7] <u>Id.</u> Moreover, the interim agreement took pains to note that Israel would "continue to exercise powers and responsibilities not so transferred." <u>Id.</u> art. I, 36 I.L.M. at 558.

The drafters of the interim agreement considered the West Bank and the Gaza Strip as a single territorial unit. Nevertheless, they subdivided the land within that unit into three main zones, each under a different level of PA control. <u>Id.</u> art. XI, 36 I.L.M. at 561-62. The overall framework required the PA to police the Palestinian populace but continued Israeli responsibility over external threats and border defense. <u>Id.</u> arts.

---

[7]The interim agreement permitted the PLO to conduct limited foreign affairs activities on behalf of the PA. Those activities pertained only to economic, cultural, scientific, and educational matters. Interim Agreement on the West Bank & the Gaza Strip art. IX, 36 I.L.M. at 560-61.

XII-XIV, 36 I.L.M. at 562-63.  Israel also retained jurisdiction over all Israeli settlers living in the territory.  Id.

The PA's legislative powers were similarly restricted. The interim agreement specified that any law that "amends or abrogates existing laws or military orders, which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this Agreement, or of any other agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio." Id. art. XVIII, 36 I.L.M. at 564-65.

In January of 1996, the PA held an election.  Question of Palestine at 51.  Negotiations on a permanent settlement began shortly thereafter, but terrorist attacks stalled the process.  Id. at 51-52.  The events giving rise to this case occurred during this period.

In August of 1998, the United Nations enhanced the PLO's observer status, granting it the right to participate in General Assembly debate, albeit without a vote.  G.A. Res. 52/250, U.N. GAOR, 52d Sess., Supp. No. 49, at 4, U.N. Doc. A/52/49 (1998). That October, Israel and the PLO signed the Wye River Memorandum (a document expressly subject to the terms of both the DOP and the interim agreement).  See Wye River Memorandum (Interim Agreement), Oct. 23, 1998, Isr.-P.L.O., 37 I.L.M. 1251.  This marked a restarting of the peace process.  The following year, the parties

negotiated a similar sort of interim agreement.  See Sharm El-Sheikh Memorandum, Sept. 4, 1999, Isr.-P.L.O., 38 I.L.M. 1465.  In 2000, however, the two sides failed in an effort to reach a final agreement.  Question of Palestine at 54.  A firestorm of Palestinian attacks and Israeli reprisals ensued.  Id. at 55.

In 2003, the Quartet — a group comprised of representatives of the United States, the European Union, the Russian Federation, and the United Nations — presented a "road map" setting forth a series of aspirational steps designed to break the impasse and move toward a permanent two-state solution in the region.  See Letter Dated 7 May 2003 from the Secretary-General Addressed to the President of the Security Council, U.N. Doc. S/2003/529 (2003).

To date, Israel and the PLO have not traveled down the newly mapped road.  Peace negotiations have been virtually non-existent since 2000, and the violence continues.  There is, however, a glimmer of hope:  the recent election of a new PA president has thawed relations between the two sides and created a sense of anticipation that a meaningful peace process will resume.  See Steven Erlanger, Abbas Declares War With Israel Effectively Over, N.Y. Times, Feb. 14, 2005, at A1.

### C.  The Merits.

We now reach the merits of the sovereign immunity defense.  In scrutinizing a district court's resolution of a

foreign sovereign immunity issue, we review factual findings for clear error and legal conclusions de novo. Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 80 (2d Cir. 2002). Here, the defendants' claim to sovereign immunity derives from their assertion that Palestine is a state, and the evidence presented to the district court in support of that assertion consisted entirely of indisputably authentic international legal documents. The district court's determination that Palestine was not a state was premised on a legal conclusion: the court determined that the defendants' documentary proffer did not satisfy the legal standard derived from international law. Our review of that decision is de novo. Id.

International law defines a state as "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) of Foreign Relations § 201. This definition derives from the Montevideo Convention of 1933. See supra Part III(A). In applying this definition, some courts have subdivided the analysis into four parts, asking whether the putative state (i) has a defined territory and (ii) a permanent population, which (iii) is under the control of its own government, and (iv) has the capacity to engage in foreign relations. See, e.g., Klinghoffer, 937 F.2d at 47-48.

In practice, the third element is the most salient factor in the statehood calculus. See Knox v. PLO, 306 F. Supp. 2d 424, 434 (S.D.N.Y. 2004); see also James Crawford, The Creation of States in International Law 42 (1979) (Creation of States). The Restatement's explanation of this element is rather sparse; it notes only that "[a] state need not have any particular form of government, but there must be some authority exercising governmental functions and able to represent the entity in international relations." Restatement (Third) of Foreign Relations § 201 cmt. d. To satisfy these requirements, a state's government must, at a bare minimum, be independent and in general control of its territory, maintaining at least a modicum of law and order.[8] See Creation of States at 45-46; see also Nii Lante Wallace-Bruce, Claims to Statehood in International Law 54 (1994) (explaining that what is required "is a coherent system of authority structures regulating . . . the territory under that government's control"). In short, the existence of a state demands a community integrated and organized as a political unit. See 1 Robert Jennings & Arthur Watts, Oppenheim's International Law 122 (9th ed. 1992). Its government must speak for the state as a whole; the mere presence of independent tribes or factions within a territory, lacking

---

[8]Of course, if statehood exists at a finite point in time, it is not terminated by belligerent occupation, without more. See Restatement (Third) of Foreign Relations § 201, reporter's note 3 (explaining that "[m]ilitary occupation, whether during war or after an armistice, does not terminate statehood").

common institutions, cannot constitute a government in control. See Western Sahara, 1975 I.C.J. 12, 63 (Oct. 16).

The first, second, and fourth elements are dependent on (or, sometimes, subsumed by) the third. As to the first — defined territory — the "only requirement is that the State must consist of a certain coherent territory effectively governed." Creation of States at 40. As such, this element is merely a function of independence and governmental control. Id. So too the second element, which typically is satisfied by showing a permanent population within the defined territory. See id. at 40-42. The relationships of these elements with the all-important third element is readily evident. As one court put it, the question is essentially whether the entity claiming statehood has a "defined territory under its control" and a "permanent population under its control." Knox, 306 F. Supp. 2d at 434 (emphasis in original).

The fourth element — "capacity to engage in foreign relations" — focuses on "competence, within [a state's] own constitutional system, to conduct international relations with other states, as well as the political, technical, and financial capabilities to do so." Restatement (Third) of Foreign Relations § 201 cmt. e. Again, this is a function of independence and effective government control. See Creation of States at 47-48. In that sense, then, it too is dependent on the third element.

-34-

We add that the party who alleges sovereign immunity has the burden of proving that status. See Drexel Burnham Lambert Group, Inc. v. Comm. of Receivers, 12 F.3d 317, 325 (2d Cir. 1993); Alberti v. Empresa Nicaraguense de la Carne, 705 F.2d 250, 253 (7th Cir. 1983). With this in mind, we move from the general to the specific.

The defendants argue that the state of Palestine exists; that they constitute core elements of that state; and that, therefore, they are immune from suit under the FSIA (and, thus, under the ATA). This argument has a quicksilver quality: it is hard to pin down exactly when or how the defendants assert that Palestine achieved statehood. At various points in their briefs, they hint at three possibilities: (i) the period from the beginning of the mandate through the 1967 Arab-Israeli war; (ii) the period from the end of that war up until the creation of the Palestinian Authority (1994); and (iii) the period from 1994 forward. In an abundance of caution, we consider whether the defendants have made a prima facie showing of statehood at any such juncture.

For each of the three periods, the defendants' proffer is much the same anent the first and second elements of the test for statehood. With respect to the first, the defendants consistently claim that Palestine comprises the territory defined by Security Council Resolution 242, that is, those portions of the once and

former mandate territory occupied by Israel during the 1967 war (including the West Bank, the Gaza Strip, and East Jerusalem). With respect to the second element, the defendants asseverate that this territory has had a permanent population from time immemorial (and, thus, that it had such a population throughout the three periods with which we are concerned). Assuming, arguendo, the accuracy of these averments, the focus shifts to the third prong of the test for statehood. At that stage, the question becomes whether the defendants have shown that the identified territory and population are self-governing. In answering this question, we look separately at each period.

1. **The Initial Period**. As to the pre-1967 period, the defendants' argument seems to be that the territory that comprised the Palestinian portion of the mandate was a state prior to, during, and after the mandate. Their support for this thesis is very weak; they assert only that throughout this interval there were local governmental institutions in place that catered to the Palestinian populace.

This assertion is manifestly insufficient to make the defendants' prima facie case of statehood. The third element of the test requires governmental independence and control of a defined territory. That element plainly was not satisfied while the defined territory was part of the Ottoman Empire; even if the Palestinian people exercised operating control over domestic

governmental functions in the region — and the defendants offer nothing to support such a claim — that would not be sufficient to show the existence of an independent political unit that <u>controlled</u> the territory.

The same is true for the latter portions of the period. During the currency of the mandate, the United Kingdom exercised suzerainty over the administration and laws of the defined territory. <u>See</u> <u>Klausner</u> v. <u>Levy</u>, 83 F. Supp. 599, 600 (E.D. Va. 1949). Following the United Kingdom's relinquishment of the mandate and the onset of the 1967 Arab-Israeli war, the Israelis occupied much of the land designated for a future Arab state, and the Egyptians and Jordanians seized the rest. The net result is that, at all times, other states had control over the defined territory.

The defendants resist the obvious conclusion. In particular, they rely upon United Nations General Assembly Resolution 181(II), noting that it called for an independent Arab state to come into existence no later than October 1, 1948, and that this became a reality in the sense that "Palestinian government institutions continued to function under Egyptian and Jordanian occupation much as they had under the Mandate." Appellants' Br. at 21. These assertions are insufficient to show that a political unit was in control of the defined territory and populace. The mere fact that the United Nations conceived an

aspirational plan for Palestinian statehood does not establish the existence of a state. Nor does the fact that the Egyptians and Jordanians occupied and controlled a significant portion of the defined territory immediately following the end of the mandate aid the defendants' cause. To the contrary, the fact is a stark reminder that no state of Palestine could have come into being at that time. See Knox, 306 F. Supp. 2d at 437 (noting that under "international law, a state will maintain its statehood during a belligerent occupation . . . but it would be anomalous indeed to hold that a state may achieve sufficient independence and statehood in the first instance while subject to and laboring under the hostile military occupation of a separate sovereign").

2. **The Middle Period**. The interval following the occupation of the West Bank and the Gaza Strip by Israel in 1967 is no more promising. With respect to this time span, the defendants rely heavily on Security Council Resolution 242 and its hortatory call for Israeli withdrawal from "territories occupied in the recent conflict" and for all states to respect and acknowledge "the sovereignty, territorial integrity and political independence of every State in the area." That reliance is mislaid. There is a vast difference between what should be and what is; the fact that some political leaders recognize that particular territory should comprise a state does not make that territory a state under the prevailing principles of international law.

What counts is that the defendants have not presented any evidence indicating that Palestine actually became a state following Israel's conquest of the lands previously occupied by Jordan and Egypt. The one circumstance to which the defendants advert — that the Israelis did not dismantle the local governmental institutions in the region — is wholly inadequate to show that there was a Palestinian state underlying the Israeli occupation. The territory went directly from Jordanian/Egyptian control to Israeli control, thus undermining the defendants' statehood argument. See id.

To be sure, the defendants point proudly to the U.N.'s 1974 recognition of the PLO. We do not minimize the political significance of that event. The fact remains, however, that neither political recognition of the PLO nor United Nations support for self-governance is sufficient to signify that the Restatement's conditions for statehood have been met. See Klinghoffer, 937 F.2d at 48 (noting that the PLO did not satisfy the objective requirements for statehood despite its political recognition by some foreign states).

3. **The Most Recent Period**. The defendants' argument for current statehood posits that Palestine's changing status over the last decade marked the emergence of the defined territory from Israeli control and the establishment of a Palestinian government in its place. The PLO's 1988 declaration of independence

-39-

adumbrated the inception of this period. The period itself commenced, however, in 1994, the signal event being the creation of the PA as an entity having some lawful authority in the West Bank and Gaza. The defendants suggest that this development signified the birth of a government sufficiently in control of the defined territory to satisfy the third element of the Restatement test. We reject the suggestion.

Undoubtedly, the agreements to which the defendants allude vested some autonomy in the newly created PA. But the authority so transferred was limited and, during and after that transition, Israel explicitly reserved control over all matters not transferred. See Interim Agreement art. I, 36 I.L.M. at 558. Several of these reserved powers are incompatible with the notion that the PA had independent governmental control over the defined territory. To illustrate, the interim agreement expressly denied the PA the right to conduct foreign relations, id. art. IX, 36 I.L.M. at 561; left Israel with an undiminished ability to defend and control the territorial borders, id. art. XII, 36 I.L.M. at 562; denied the PA the right to create or maintain either an army or a navy,[9] id. art. XIV, 36 I.L.M. at 563; retained Israeli control over the territorial airspace, id. at Annex I, art. XIII,

---

[9]The PA was permitted to organize a police force, but this force had no jurisdiction over Israeli citizens within the territory. See Interim Agreement at Annex I, art. XI, 36 I.L.M. at 585.

36 I.L.M. at 586; and placed severe restrictions on the PA's lawmaking ability (declaring, inter alia, that any laws passed in contravention of the DOP would be void ab initio), id. art. XVIII, 36 I.L.M. at 565. These restrictions remain in effect. It is, therefore, transparently clear that the PA has not yet exercised sufficient governmental control over Palestine to satisfy the third element of the Restatement test. See Geoffrey R. Watson, The Oslo Accords 68-72 (2000) (concluding that "there was no Palestinian state at the time of the signing of the Interim Agreement"); D.J. Harris, Cases and Materials on International Law 226 (5th ed. 1998) (concluding that the interim agreement "fall[s] short of [achieving] statehood for the Palestinian people"); United Nations Comm'n on Human Rights, Question of the Violation of Human Rights in the Occupied Arab Territories, Including Palestine at 12, U.N. Doc. E/Cn.4/2001/121 (2001) (noting that, as of 2001, Palestine "still falls short of the accepted criteria of statehood").[10]

The defendants do not deny that these limitations are incompatible with statehood, but, rather, contend that they were imposed by force and that the Israeli occupation is all that is

_____

[10]Indeed, this conclusion dovetails with the conclusion reached by a prominent legal advisor to the PLO during the 1999-2000 peace talks. See Omar M. Dajani, Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period, 26 Denv. J. Int'l L. & Pol'y 27, 86 (1997) (remarking that "the interim character and extraordinarily limited powers of the PA make it impossible to characterize that body as the 'effective government' of the [territory]"; see also Omar Dajani, On a Better Road This Time in the Mideast?, Wash. Post, May 4, 2003, at B1.

-41-

preventing the full exercise of the prerogatives of statehood.  The problem with this contention is that it presupposes that Palestine was a state before the Israeli occupation — and the defendants have not shown that it was.  See Knox, 306 F. Supp. 2d at 437.

We recognize that the status of the Palestinian territories is in many ways sui generis.  Here, however, the defendants have not carried their burden of showing that Palestine satisfied the requirements for statehood under the applicable principles of international law at any point in time.  In view of the unmistakable legislative command that sovereign immunity shall only be accorded to states — a command reflected in both the FSIA and the ATA — the defendants' sovereign immunity defense must fail.

## IV.  THE DEFAULT JUDGMENT

We come now to the defendants' protest that they were entitled to a final determination on the sovereign immunity question (including appellate review) before they could be required to bear any of the burdens of litigation.  In mounting this protest, the defendants place great weight on In re Papandreou, 139 F.3d 247 (D.C. Cir. 1998).  There, the Greek governmental entities and officials moved to dismiss claims against them on grounds of lack of in personam jurisdiction, forum non conveniens, and sovereign immunity.  Id. at 249.  The plaintiffs sought discovery for the limited purpose of determining whether FSIA's "commercial activity" exemption applied.  See 28 U.S.C. § 1605(a)(2).  The

defendants objected and asked the district court to adjudicate their other non-merits-based defenses before allowing any discovery. Papandreou, 139 F.3d at 254. The district court authorized the jurisdictional discovery, including the depositions of several Greek cabinet ministers. Id. at 249. The defendants petitioned for a writ of mandamus and the court of appeals obliged. The court held (i) that there were less intrusive ways of determining the applicability of the FSIA exemption, and (ii) that the trial court should have grappled with the non-merits-based defenses before subjecting the defendants to jurisdictional discovery. Id. at 254.

We do not lightly dismiss the reasoning behind Papandreou. Had the defendants in this case raised their sovereign immunity defense in a timely manner, their argument that they were entitled to adjudication of that defense before proceeding with the merits of the litigation might have some force. After all, a district court's denial of a motion to dismiss a complaint on the ground of foreign sovereign immunity is immediately appealable under the collateral order doctrine. See Price v. Socialist People's Libyan Arab Jamahiriya, 389 F.3d 192, 196 (D.C. Cir. 2004); S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292, 1295 (11th Cir. 2000); Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 387 (2d Cir. 2000); Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020,

1025 (D.C. Cir. 1997). And such an appeal ordinarily divests the district court of jurisdiction to proceed with the litigation pending its resolution. See Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 93 (1st Cir. 2003); Apostol v. Gallion, 870 F.2d 1335, 1338 (7th Cir. 1989); see also Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji, 834 F. Supp. 167, 175 (E.D. Va. 1993) (noting that foreign state's non-frivolous interlocutory sovereign immunity appeal divests district court of jurisdiction).

These principles are not absolute. None of the cited cases stand for the proposition that sovereign immunity is a trump card that may be held in reserve until a defendant sees fit to play it, thus enabling the defendant to stop the litigation in its tracks at a time of its choosing. That is simply not the law. As we have explained in a related context, "in exchange for the defendant's right to interrupt the judicial process, the court may expect a reasonable modicum of diligence in the exercise of that right." Guzmán-Rivera v. Rivera-Cruz, 98 F.3d 664, 668-69 (1st Cir. 1996) (quoting Kennedy v. City of Cleveland, 797 F.2d 297, 301 (6th Cir. 1986)). Demanding such diligence is "virtually essential to orderly judicial management of the vexing procedural problems"

that accompany assertions of immunity.[11]  <u>Fisichelli</u> v. <u>City Known</u> <u>as Town of Methuen</u>, 884 F.2d 17, 19 (1st Cir. 1989).

The defendants, for whatever reason, elected not to assert sovereign immunity in either of their first two motions to dismiss.  By the time that the district court ordered the entry of a default, the defendants still had not moved to dismiss on the ground of sovereign immunity.  The district court found, and the defendants' own words appear to confirm, that this recalcitrance was intentional and designed to accomplish some obscure strategic aim.  <u>See</u> <u>Ungar IV</u>, 325 F. Supp. 2d at 23-24.

Given this sequence of events, the defendants' arguments are unpersuasive.  Here, as contemplated in <u>Papandreou</u>, discovery was stayed until the defendants had a full determination of the non-merits-based defenses that they initially chose to assert (including insufficiency of process, forum non conveniens, and lack of in personam jurisdiction).  After rejecting those defenses and denying two motions to dismiss, the district court in effect

---

[11]Of course, an entity alleging an entitlement to sovereign immunity may choose to ignore an action or court order directed at it, accept a default, and then assert its immunity at a later state of the litigation.  But such a choice represents a rather risky gamble.  If the assertion of immunity is valid, the defendant wins the entire pot (i.e., it walks away from the suit unscathed) but if the assertion of immunity fails, the defendant loses outright (i.e., it must live with the default).  There is no need to engage in such high-stakes wagering.  A defendant may both assert sovereign immunity and defend on the merits.  <u>See</u> <u>MCI Telecomm.</u> <u>Corp.</u> v. <u>Alhadhood</u>, 82 F.3d 658, 662 (5th Cir. 1996); <u>Practical</u> <u>Concepts, Inc.</u> v. <u>Republic of Bolivia</u>, 811 F.2d 1543, 1547 (D.C. Cir. 1987).

ordered the litigation to proceed. The defendants — who to that point had not raised a sovereign immunity defense — nonetheless refused either to answer the amended complaint or to comply with the court's discovery orders. In view of this history, we believe that the district court acted well within the encincture of its discretion in entering the default. See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951-52 (11th Cir. 1996) (permitting entry of default against foreign state due to its willful failure to comply with court orders). The defendants deliberately chose to hold off on asserting a sovereign immunity defense — and they must live with the consequences of that choice.[12]

## V.  CONCLUSION

We need go no further. The defendants have not shown that this case involves nonjusticiable political questions. By like token, they have not shown that Palestine is a state and, as a consequence, they do not have available to them the buckler of sovereign immunity. Consequently, they cannot set aside the

_____

[12]We recognize, of course, that the existence vel non of foreign sovereign immunity implicates federal subject matter jurisdiction. Thus, the failure to raise the defense in a timely manner cannot result in a waiver. See, e.g., Haven v. Polska, 215 F.3d 727, 733 (7th Cir. 2000). Nevertheless, a failure of that kind can appropriately affect the trial court's management of the litigation. See, e.g., Bolduc v. United States, ___ F.3d ___, ___ (1st Cir. 2005) [No. 03-2081, slip op. at 9] (explaining that "the belated filing of a motion to dismiss for want of subject matter jurisdiction can have consequences in terms of a court's case-management decisions"). That is the situation here.

-46-

judgment on that ground.  And, finally, they have failed to show that the district court acted precipitously either in entering a default or in reducing the default to judgment.  Accordingly, we reject their appeal.

**Affirmed**.