*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0417p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES H. O'BRYAN, DONALD E. POPPE, and
MICHAEL J. TURNER,
  *Plaintiffs-Appellees/Cross-Appellants,*

  *v.*

HOLY SEE,
  *Defendant-Appellant/Cross-Appellee.*

Nos. 07-5078/5163

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00338—John G. Heyburn II, Chief District Judge.

Argued: March 18, 2008

Decided and Filed: November 24, 2008

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffrey S. Lena, LAW OFFICES OF JEFFREY S. LENA, Berkeley, California, for Appellant. William F. McMurry, McMURRY & ASSOCIATES, Prospect, Kentucky, for Appellees. Lewis Yelin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF:** Jeffrey S. Lena, LAW OFFICES OF JEFFREY S. LENA, Berkeley, California, John D. Dyche, R. Gregg Hovious, FULTZ, MADDOX, HOVIOUS & DICKENS, Louisville, Kentucky, for Appellant. William F. McMurry, Adrienne W. Kim, McMURRY & ASSOCIATES, Prospect, Kentucky, Douglas H. Morris II, Lea A. Player, MORRIS & PLAYER, Prospect, Kentucky, for Appellees. Lewis Yelin, Douglas N. Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Defendant Holy See appeals the district court's denial, in part, of its motion to dismiss all of plaintiffs' claims due to lack of subject matter jurisdiction. The Holy See contends that the district court has no subject matter jurisdiction over plaintiffs' claims because the Holy See is immune from suit as a foreign state pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* Plaintiffs James H. O'Bryan, Donald E. Poppe, and Michael J. Turner ("plaintiffs") cross-appeal the district court's partial grant

1

of the Holy See's motion to dismiss. Plaintiffs claim that the FSIA does not immunize the Holy See from suit on the grounds alleged in their complaint and thus the district court does in fact have subject matter jurisdiction in this case. The United States as intervenor and *amicus* supports the position of the Holy See with respect to the Holy See's status as a foreign state and the constitutionality of the FSIA. For the following reasons, we affirm the decision of the district court.

I.

On June 4, 2004, plaintiffs, who claim to have been victims of sexual abuse by Roman Catholic clergy, filed a class action suit against the Holy See. The Holy See is both a foreign state and an unincorporated association and the central government of an international religious organization, the Roman Catholic Church. The United States has recognized the Holy See as a foreign sovereign since 1984. According to their complaint, plaintiffs consist of representatives for two separate classes. James H. O'Bryan and Donald E. Poppe serve as the representatives of Class I, which "consists of all persons who have not previously brought claims against an agent or servant of the Defendant, Holy See, in the United States . . . arising out of sexual abuse he or she suffered at the hands of a Roman Catholic priest, cleric, bishop, archbishop, cardinal, agent or employee . . . ." Michael J. Turner serves as the representative of Class II, which "consists of all persons who have previously brought claims against an agent or servant of the Defendant, Holy See, in the United States . . . arising out of sexual abuse he or she suffered at the hands of a Roman Catholic priest, cleric, agent or employee . . . ." All three representatives were residents of Kentucky and citizens of the United States at the time of the alleged sexual abuse by local Catholic priests.

> As representatives, the plaintiffs allege the following underlying facts in support of their suit.

> Plaintiff, James H. O'Bryan, was sexually abused, molested and assaulted by a Roman Catholic priest in the 1920s, while Plaintiff was under the care, custody, authority, control and influence of an abusive Roman Catholic priest, which authority was granted to him by the Defendant, Holy See.

> Plaintiff, Donald E. Poppe, was sexually abused, molested and assaulted by a Roman Catholic priest in the 1960s, while Plaintiff was under the care, custody, authority, control and influence of an abusive Roman Catholic priest, which authority was granted to him by the Defendant, Holy See.

> Plaintiff, Michael J. Turner, was sexually abused, molested and assaulted by a Roman Catholic priest in the mid 1970s, while Plaintiff was under the care, custody, authority, control and influence of an abusive Roman Catholic priest, which authority was granted to him by the Defendant, Holy See.

In all cases, plaintiffs allege that the sexual molestation in question "occurred while the abusive Roman Catholic priest, agent, servant or employee was acting within the scope of his employment, as part of an agency relationship with the Defendant, Holy See, and the misconduct was committed with the apparent authority arising from this employment and/or agency relationship."

Plaintiffs' claims regarding the liability of the Holy See stem, in large part, from their allegations regarding the purported policy of the Holy See towards accusations of sexual abuse leveled against clergy:

> [T]he Holy See has mandated that all allegations of childhood sexual abuse be kept under a cloak of complete secrecy, even if that secrecy violated state, federal, or international law. In March, 1962, the Holy See privately circulated a document containing a set of procedural norms for dealing with the solicitation of sex in confession, clergy sex with minors, homosexual relations, and bestiality. This

document [the "1962 Policy"] – an official legislative text issued by the Congregation of the Holy Office and specifically approved by Pope John XXIII – imposes the highest level of secrecy on the handling of clergy sexual abuse matters. . . . This secret document was first discovered and made public in July, 2003 by news media in the United States and throughout the world. The policies of the Holy See expressed in this and other documents require bishops in the United States to, among other things, refuse to report childhood sexual abuse committed by priests to criminal or civil authorities, even where such failure to report would itself be a criminal offense.

(Plaintiff's Complaint, Introduction.)   On behalf of Class I, plaintiffs outline in their complaint the following causes of action:[1] violation of customary international law of human rights; negligence; breach of fiduciary duty; and the tort of outrage/intentional infliction of emotional distress. In addition, plaintiffs advance claims of deceit and misrepresentation against the Holy See "in its capacity as an Unincorporated Association and Head of an International Religious Organization Only." Finally, plaintiffs, on behalf of Class I, request injunctive relief.

On behalf of Class II, plaintiffs outline in their complaint the following causes of action: violation of customary international law of human rights; negligence; breach of fiduciary duty; and the tort of outrage/intentional infliction of emotional distress. In addition, plaintiffs advance claims of deceit and misrepresentation against the Holy See "in its capacity as an Unincorporated Association and Head of an International Religious Organization Only." Finally, plaintiffs, on behalf of Class II, request injunctive relief.

Plaintiffs assert in their complaint that federal subject matter jurisdiction exists in this case on a number of grounds. First, plaintiffs advance claims of federal jurisdiction under the FSIA, 28 U.S.C. § 1602 *et seq.* Assuming that the Holy See is a "foreign state" within the meaning of 28 U.S.C. § 1603, plaintiffs claim that federal jurisdiction attaches because (1) the Holy See has waived its immunity pursuant to 28 U.S.C. § 1605(a)(1); (2) the Holy See was acting in a commercial capacity pursuant to 28 U.S.C. § 1605(a)(2); or (3) the money damages that are sought are for personal injuries stemming from the Holy See's tortious conduct pursuant to 28 U.S.C. § 1605(a)(5).

Alternatively, assuming that the Holy See is not a "foreign state" within the meaning of 28 U.S.C. § 1603, plaintiffs assert that this court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

On April 4, 2005, the Holy See filed a motion to dismiss on the grounds that the plaintiffs' complaint failed to state a claim upon which relief can be granted, lack of subject matter jurisdiction, lack of personal jurisdiction, insufficient process and insufficient service of process. In its memorandum and opinion of October 7, 2005, the district court addressed the Holy See's claim that the service of process had been insufficient. In doing so, the district court began its analysis by determining that the Holy See was in fact a "foreign state" within the meaning of the FSIA. In turn, the district court found that plaintiffs had not satisfied the service of process requirements under the FSIA, 28 U.S.C. § 1608(a). However, the district court found that because the plaintiffs had made good faith attempts to perfect service of process, it would grant them an additional 60 days in which to perfect service. *O'Bryan v. Holy See*, 490 F. Supp 2d 826, 832 (W.D. Ky. 2005) ("*O'Bryan I*").

---

[1]Plaintiffs also plead a separate cause of action titled "Respondeat Superior Liability." However, *respondeat superior* is not a cause of action. It is a basis for holding the Holy See responsible for the acts of its agents. Thus, *respondeat superior* will factor in to our discussion of the other claims advanced by plaintiffs but will not be treated separately.

On January 10, 2007, the district court determined that plaintiffs had perfected service of process and therefore went on to consider the Holy See's motion to dismiss on the grounds that there was no subject matter jurisdiction in the instant case. In its memorandum and opinion, the district court determined that while subject matter jurisdiction did not exist for a number of plaintiffs' claims, a number of the plaintiffs' claims fell within the exceptions to the immunities granted foreign states under FSIA. In doing so, the district court concluded that plaintiffs had sufficiently pled that the clergy in the United States were Holy See's employees; in turn, because the Holy See had declined to provide evidence to the contrary, the district would presume that the clergy in question were in fact Holy See employees. However, the district court remained "open to reconsidering its decision that the United States-based bishops, archbishops, and other clergy of the Roman Catholic Church are employees of the Holy See for purposes of FSIA if further contrary evidence emerges during the litigation." The district court summarized its holdings as follows:

> In summary, this Court will dismiss the Plaintiffs' negligence claim that Defendant Holy See failed to provide safe care of children entrusted to the clergy. The Court also will dismiss Plaintiffs' deceit and misrepresentation claims. However, the Court will deny Defendant's motion to dismiss as to the failure to report and failure to warn negligence claims and as to all other claims asserted against the Holy See at this time. Therefore, the following claims remain against the Holy See: negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of respondeat superior.

The Holy See appealed the district court's order denying, in part, its motion to dismiss and plaintiffs subsequently cross-appealed. In their Final Second Brief, the plaintiffs argued, for the first time, that the application of the FSIA to the Holy See violated the Establishment Clause. Because the plaintiffs' new contentions amounted to a challenge of the FSIA's constitutionality, the United States, pursuant to 28 U.S.C. § 2403(a), intervened as a matter of right to defend the constitutionality of the FSIA. The United States also intervened as an *amicus curiae* supporting the position of the Holy See regarding its status as a foreign sovereign. The United States took no position on the applicability of the statutory exceptions to immunity with respect to plaintiffs' claims.

## II.

Because "sovereign immunity is an immunity from trial, not just a defense to liability on the merits, the denial of a claim of sovereign immunity is immediately appealable under the collateral order doctrine as a final decision, pursuant to 28 U.S.C. § 1291." *Keller v. Cent. Bank of Nig.*, 277 F.3d 811, 815 (6th Cir. 2002). This court "review[s] de novo questions of subject matter jurisdiction." *Bauer v. RBX Indus.*, 368 F.3d 569, 578 (6th Cir. 2004) (citing *Caudill v. N. Am. Media Corp.*, 200 F.3d 914, 916 (6th Cir. 2000)). However, "[a] district court's decision to exercise supplemental jurisdiction over state law claims that are related to the federal question claim is reviewed only for abuse of discretion." *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 200 (6th Cir. 2004).

## III.

As stated in 28 U.S.C. § 1604, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605-1607 of this chapter." However, the FSIA does not itself define the term "foreign state." *See, e.g.*, *Ungar v. Palestinian Liberation Org.*, 402 F.3d 274, 283 (1st Cir. 2005).

In determining whether a particular entity constitutes a "foreign state" courts typically adopt one of two approaches. A number of courts have looked to the criteria enumerated in Restatement (Third) of the Foreign Relations Law of the United States § 201: "Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." *See Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 158-59 (D.D.C. 2006) (collecting cases); *see also Ungar*, 402 F.3d at 283 (noting that FSIA's legislative history makes it clear that the "objective of the bill was to codify sovereign immunity doctrine as recognized by international law and to ensure that this international standard would be applied in federal litigation"); *Morgan Guar. Trust Co. v. Republic of Palau*, 924 F.2d 1237, 1243 (2d Cir. 1991) (relying primarily on the Restatement standard for determining whether the appellee was a "foreign state" under FSIA). However, as the First Circuit noted in *Ungar*, "the Restatement standard . . . is not inevitably correct. It may be argued that a foreign state, for purposes of the FSIA, is an entity that has been recognized as a sovereign by the United States government." 402 F.3d at 284 n.6. Regardless, as the court noted in *Ungar*, when both standards lead to the same conclusion, courts need not choose as "all roads lead to Rome." *Id*.

In this case, there is no dispute that the United States recognized the Vatican in 1984,[2] and there is no dispute between the parties that the *State of the Vatican* is a foreign state within the meaning of FSIA. (Appellee's Br. 21 ("The Holy See, as State of the Vatican, meets the[] requirements [of the Restatement Standard]")). *See also Dale v. Colagiovanni*, 337 F. Supp. 2d 825, 832 (S.D. Miss. 2004) (vacated on other grounds) (treating the Vatican as a foreign state for the purposes of the FSIA); *English v. Thorne*, 676 F. Supp. 761, 764 (S.D. Miss. 1987) (same).[3]

Plaintiffs, however, contend that the "Holy See . . . . *as the head of the Roman Catholic Church*, . . . has no defined territory and no permanent population, and thus does not" satisfy the definition of "foreign state" under the Restatement's standard. (Appellee's Br. 21 (emphasis added)).

Plaintiffs' argument remains somewhat obscure. As noted, plaintiffs admit that the Holy See, as State of the Vatican, is a foreign state within the meaning of FSIA. Thus, they do not dispute that the entity recognized by the United States government as a foreign state is indeed a foreign sovereign. Instead, plaintiffs appear to advance one of two arguments. The first possible interpretation of plaintiffs' argument is that they ask this court to conceive of the Holy See as two separate entities – first, a foreign sovereign, recognized by the United States government, and second, an unincorporated head of an international religious organization (Appellee's Br. 21 ("The Holy See, as State of the Vatican, meets the[] requirements [of the Restatement Standard]," but the "Holy See . . . . as the head of the Roman Catholic Church, . . . has no defined territory and no

---

[2] *See, e.g.*, *Ams. United for Separation of Church & State v. Reagan*, 786 F.2d 194, 197 (3d Cir. 1986) (noting that diplomatic relations between the United States and the Vatican began in 1984).

[3] Plaintiffs argue that because the conduct in question preceded the United States' recognition of the Holy See as a foreign sovereign, this court should not apply FSIA. This argument also fails. First, as a general principle of international law, "recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918). More importantly, "the principal purpose of foreign sovereign immunity has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts. Rather, such immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some *present* 'protection from the inconvenience of suit as a gesture of comity.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004) (emphasis in original) (holding that FSIA can be retroactive in application) (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003)). Thus, the purpose of FSIA is to grant immunity based upon the current relationship between the United States and the relevant foreign sovereign. Because the United States currently has diplomatic relations with the Holy See, foreign sovereign immunity applies even to prior conduct.

permanent population, and thus does not" satisfy the definition of "foreign state" under the Restatement's standard")). Alternatively, they ask this court not to consider the Holy See, a single entity, a foreign sovereign in this case because the Holy See was acting in a non-sovereign capacity when it engaged in the conduct alleged in plaintiffs' complaint. Compl. ¶ 22 ("At the same time, and wholly distinct and separate from its role and activities as a sovereign, [the Holy See] is an unincorporated association and head of the Roman Catholic Church, an international religious organization.").

Plaintiffs' argument fails under either construction. With respect to the first alternative – the two-entity alternative – the district court correctly noted that "[p]laintiffs cite no authority for the proposition that the Holy See may be sued in a separate, non-sovereign function as an unincorporated association and as head of an international religious organization." *O'Bryan I*, 490 F. Supp. 2d at 830. To the contrary, courts have generally treated the Holy See as a foreign state for purposes of the FSIA. *See Dale*, 337 F. Supp. 2d at 832 (treating the Vatican as a foreign state for the purposes of the FSIA); *English*, 676 F. Supp. at 764 (concluding that the Vatican is a foreign state for the purposes of the FSIA); *Doe v. Holy See*, 434 F. Supp. 2d 925, 933 (D. Or. 2006) (applying FSIA's foreign state status to the Holy See). Consequently, we reject plaintiffs' contention that they are not suing the Holy See that has been recognized by the United States government, but a parallel non-sovereign entity conjured up by the plaintiffs.

The structure and intent of the FSIA also counsel us to reject the plaintiffs' alternative capacity approach. As the Supreme Court has explained, by enacting FSIA, Congress intended to adopt the "restrictive theory" of sovereign immunity, "under which 'the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*).'" *Permanent Mission of India to the U.N. v. City of New York*, 127 S. Ct. 2352, 2357 (2007) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711 (1976)).

In order to implement the "restrictive theory" of sovereign immunity and limit immunity to sovereign acts but not private acts, Congress crafted exceptions to FSIA. *See* 28 U.S.C. 1605(a). For example, "[t]he 'commercial activity' exception of the FSIA withdraws immunity in cases involving essentially private commercial activities of foreign sovereigns that have an impact within the United States." *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994); *see also Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 983 (10th Cir. 2007) ("The FSIA's commercial activity exceptions, however, permit a foreign sovereign to be sued in a court within the United States, to the same extent as any private individual . . . ."). In this way, Congress constructed the FSIA to immunize foreign sovereigns acting in a public capacity, while ensuring that essentially private activities would be actionable under the FSIA exceptions.

For these reasons, the Supreme Court has stated "[w]e think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *accord Am. Telecom Co., L.L.C. v. Republic of Leb.*, 501 F.3d 534, 538 (6th Cir. 2007). This conclusion stems from the FSIA's rule-plus-exceptions structure; if a party believes that the foreign state was not acting in its capacity as a sovereign, but instead in its private capacity, then the party can seek redress via one of the FSIA's exceptions.

Thus, if plaintiffs believe that the Holy See acted in a private capacity, then the plaintiffs are limited to arguing that an exception to the FSIA applies; such claims cannot serve as reasons to avoid the FSIA altogether. The exceptions to FSIA capture all instances where Congress has deemed conduct, if pursued by a foreign sovereign, sufficiently private so as to eliminate foreign sovereign immunity. In turn, the alternative-capacity argument can only succeed to the extent that

it identifies conduct that fits within one of the exceptions outlined under FSIA. *See* 28 U.S.C. § 1605(a).[4]

IV.

We next consider the plaintiffs contention that the FSIA, as applied to the Holy See, violates the Establishment Clause.

"Issues that are not squarely presented to the trial court are considered waived and may not be raised on appeal." *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1172 (6th Cir. 1996). Similarly, "vague references fail to clearly present the objection in the district court so as to preserve the issue for appellate review." *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1399 (6th Cir. 1995).

Plaintiffs contend that they preserved their constitutional claims by articulating them in their response to the Holy See's motion to dismiss. However, plaintiffs' response brief includes no such constitutional claims. Plaintiffs' response to *the Holy See's* First Amendment challenges cannot preserve plaintiffs' own Establishment Clause claim. Thus, plaintiffs waived their constitutional challenges to the FSIA.[5]

V.

We next address the Holy See's contention that the district court misapplied the FSIA's burden-shifting process.

In the proceedings before the district court, the Holy See filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). This motion presented a facial attack to plaintiffs' complaint.

---

[4]Both the Holy See and the United States argue that this court should refrain from making a determination regarding whether the Holy See is a foreign sovereign because such an issue is a non-justiciable political question. They rely on the following language: "It has been specifically decided that 'Who is the sovereign, de jure or de facto, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government.'" *Oetjen*, 246 U.S. at 302 (quoting *Jones v. United States*, 137 U.S. 202, 212 (1890)); *see also United States v. Belmont*, 301 U.S. 324, 328 (1937) ("[T]hat who is the sovereign of a territory is not a judicial question, but one the determination of which by the political departments conclusively binds the courts; and that recognition by these departments is retroactive and validates all actions and conduct of the government so recognized from the commencement of its existence.").

This argument misapprehends the nature of the court's inquiry. Plaintiffs do not ask this court to contravene the executive branch's recognition of the Holy See as a foreign sovereign. Instead, they either ask this court to determine that they can rightfully bring suit against a parallel religious entity that also goes by the name "Holy See" or that the conduct of the Holy See rendered it a private actor *in this case*. Courts routinely determine whether incorporated entities satisfy the criteria necessary to be considered an agency or instrumentality of a recognized foreign state pursuant to 28 U.S.C. § 1603(b) without becoming entangled in a non-justiciable political question. *See, e.g.*, *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir. 1988) (agreeing with the district court's determination that the corporation in question could qualify for foreign sovereign immunity status because the majority owner of the corporation was a foreign state) (abrogated on other grounds by *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607 (1992)); *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993) (same). And courts can consider the conduct of the Holy See in order to determine whether the type of conduct alleged should cause the Holy See to lose its sovereign immunity. *See* 28 U.S.C. § 1605(a).

[5]Although this court "may exercise [its] discretion to review an issue not raised below in exceptional cases or particular circumstances, or when the rule would produce a plain miscarriage of justice," *United States v. Chesney*, 86 F.3d 564, 567-68 (6th Cir. 1996) (internal quotation marks and citation omitted), we see no such exceptional circumstances in this case.

As this court has previously noted, "Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Id.* And, "[w]hen reviewing a facial attack, a district court takes the allegations in the complaint as true . . . . If those allegations establish federal claims, jurisdiction exists." *Id.* However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005).

Applying the standards under 12(b)(1) to the FSIA context is complicated by FSIA's burden-shifting process. As previously noted by this court, the legislative history of FSIA clearly envisions a burden-shifting process:

> The burden will remain on the foreign state to produce evidence in support of its claim of immunity. Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state – that is, an act not within the exceptions in sections 1605-1607. Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state.

*Gould*, 853 F.2d at 452 n.5 (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 1, 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6616) (abrogated on other grounds by *Republic of Arg.*, 504 U.S. 607).

The Holy See contends that this burden-shifting process was misapplied by the district court. In addressing the Holy See's motion to dismiss, the district court explained that "once the *asserted allegations* bring claims within the statutory exceptions to FSIA, the burden then shifts to the party asserting immunity to prove that the exceptions do not apply." *O'Bryan v. Holy See*, 471 F. Supp. 2d 784, 791 (W.D. Ky. 2007) ("*O'Bryan II*") (citing *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 707-08 (9th Cir. 1992)) (emphasis in original). The Holy See, however, argues that the burden-shifting analysis, because of its reliance on evidence from the parties, cannot be applied to a facial motion to dismiss, which simply attacks the legal sufficiency of the complaint.

Federal courts have consistently applied the FSIA's burden-shifting process to facial motions to dismiss; in doing so, courts simply look to the general standards for evaluating motions to dismiss pursuant to Rule 12(b)(1) and take the factual allegations of the plaintiff as true. *See, e.g.*, *Siderman de Blake*, 965 F.2d at 708 n.9 (noting that "even if the [plaintiffs] had presented nothing more than the allegations in their complaint . . . it would have been incumbent upon [defendant] to respond to those allegations"); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004) ("[I]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the [FSIA] exceptions to immunity invoked by the plaintiff.") (quoting *Phoenix Consulting, Inc. v. Republic of Angl.*, 216 F.3d 36, 40 (D.C. Cir. 2000)); *Doe*, 434 F. Supp. 2d at 933 ("If the foreign state makes [the "foreign state"] showing, the burden of production shifts to the plaintiff to show, *either by the allegations in the complaint* or by extrinsic evidence, that at least one of the FSIA exceptions applies. Once the plaintiff offers evidence that an exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." (internal citations and quotation marks omitted; emphasis added)).

We conclude that the district court correctly applied the FSIA's burden shifting process. It first determined that the Holy See was a foreign state and thus eligible for immunity from suit under the FSIA. *O'Bryan I*, 490 F. Supp. 2d at 829-30. Having done so, it considered the allegations in plaintiffs' complaint that a number of exceptions to FSIA immunity applied and concluded that the tortious act exception did in fact apply. *O'Bryan II*, 471 F. Supp. at 792. As the district court correctly noted, the Holy See could still retain immunity if it could "prove that the exceptions do not apply." *Id*. at 791. Such proof would presumably amount to a "factual attack" pursuant to Rule 12(b)(1). *Cf. Gentek Bldg. Prods.*, 491 F.3d at 330 ("Where . . . there is a factual attack on the subject-matter jurisdiction alleged in the complaint, no presumptive truthfulness applies to the allegations.").

## VI.

Because the plaintiffs can only bring suit against the Holy See in its capacity as a foreign sovereign, the district court has subject matter jurisdiction over the dispute only if the Holy See is "not entitled to immunity [under any of the the FSIA exceptions]." *See* 28 U.S.C. § 1330(a). Title 28 U.S.C. § 1605(a) provides the following relevant exceptions to a foreign state's immunity under the FSIA:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;[6]
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;
>
> . . .
>
> (5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to –
>
> > (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
> > (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . .

---

[6]While plaintiffs raised the waiver exception in their complaint, they have abandoned this argument in their briefs before this court.

The district court determined that the "commercial activity" exception did not apply, *O'Bryan II*, 471 F. Supp. 2d at 789, a determination that the plaintiffs contest in their cross-appeal.[7] The district court also found that it had subject matter jurisdiction over some of the plaintiffs' claims under the "tortious act" exception, *id.* at 792, a determination that the Holy See now appeals. We will consider the application of the various exceptions to sovereign immunity under the FSIA in turn.

### a.        The Commercial Activity Exception

As noted above, the commercial activity exception reads as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2). "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). In addition, "the commercial activity relied upon by plaintiff for jurisdictional purposes must be also the activity upon which the lawsuit is based; that is, there must be a connection between that activity and the act complained of in the lawsuit." *Gould*, 853 F.2d at 452 (citing *Riedel v. Bancam, S.A.*, 792 F.2d 587, 591 (6th Cir. 1986)).

The Supreme Court has further analyzed the statutory definition of commercial activity, stating that

> [W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the

---

[7]The Holy See argues that this court has no jurisdiction to hear plaintiffs' cross-appeal. This court has jurisdiction to hear the Holy See's appeal because the "denial of sovereign immunity is immediately appealable under the collateral order doctrine as a final decision, pursuant to 28 U.S.C. § 1291." *Keller*, 277 F.3d at 815. In order to hear plaintiffs' cross-appeal, this court would have to exercise pendent jurisdiction: "The doctrine of pendent appellate jurisdiction allows an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction." *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998). "A pendent appellate claim can be regarded as 'inextricably intertwined' with a properly reviewable claim only if the pendent claim 'is coterminous with, or subsumed in, the claim before the court on interlocutory appeal.'" *Id.* (quoting *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1025, 1028 (10th Cir. 1998)). To be sure, "[t]he 'inextricably intertwined' requirement of pendent appellate jurisdiction is not meant to be loosely applied as a matter of discretion; rather, such jurisdiction only may be exercised when the appealable issue at hand cannot be resolved without addressing the nonappealable collateral issue." *Id.*

Despite this strict standard for pendent jurisdiction, we conclude that pendent jurisdiction should be exercised in this case. Plaintiffs seek to challenge the district court's ruling on the applicability of the commercial activity exception of the FSIA. The ultimate issue of this interlocutory appeal – whether the Holy See is immune from suit pursuant to the FSIA – also hinges on a finding that this exception does not apply. Moreover, given the relatedness of the two exceptions, judicial economy would counsel hearing these two issues together. *Cf. Rendall-Speranza v. Nassim*, 107 F.3d 913 (D.C. Cir. 1997) (exercising pendent appellate jurisdiction pursuant to an interlocutory appeal of the denial of sovereign immunity under the FSIA).

issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce.

*Republic of Arg.*, 504 U.S. at 614 (internal quotation marks and citations omitted). By "withdraw[ing] immunity in cases involving essentially private commercial activities," the commercial activity exception "reflects the 'restrictive' theory of sovereign immunity that underlies the FSIA." *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994).

The Supreme Court applied the *Weltover* standard in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993). In *Nelson*, the plaintiff, a United States citizen and a former employee of the Saudi government, had allegedly been imprisoned and tortured by Saudi officials for reporting defects regarding hospital equipment to a Saudi government commission. Upon release, the plaintiff filed suit against the Saudi government, alleging, *inter alia*, that the government was negligent in its failure to warn him of the undisclosed dangers of his employment position (*i.e.* the likelihood of being imprisoned and tortured). *Id.* at 352-54. In finding that the Saudis' conduct was not commercial in nature, the Supreme Court analyzed Nelson's claims as follows:

> [T]he intentional conduct alleged here (the Saudi Government's wrongful arrest, imprisonment, and torture of Nelson) could not qualify as commercial under the restrictive theory. The conduct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature . . . . Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.

*Id.* at 361-62. Indeed, directly addressing Nelson's attempt to advance a failure-to-warn theory of the case, the Supreme Court responded:

> [T]his is merely a semantic ploy. For aught we can see, a plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn, simply by charging the defendant with an obligation to announce its own tortious propensity before indulging it. To give jurisdictional significance to this feint of language would effectively thwart the Act's manifest purpose to codify the restrictive theory of foreign sovereign immunity.

*Id.* at 363.

The analysis in *Weltover* and *Nelson* points to two distinct limitations on the application of the commercial activity exception. First, the activity must be of the type in which private individuals engage; if the activities in question are not private, but sovereign in nature, then the commercial activity exception will not apply. This flows from the purpose of the commercial activity exception – to encapsulate the restrictive theory of sovereign immunity, which grants immunity for the public, not private, actions of a sovereign. *Permanent Mission of India to the UN v. City of New York*, 127 S. Ct. 2352, 2357 (2007) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711 (1976)); *see also City School of Detroit v. Government of France*, 1990 U.S. Dist. LEXIS 19577, at *9-*10 (E.D. Mich. 1990) (concluding that the commercial activity exception did not apply because "[t]he granting of accreditation to a private school by a foreign government is by its very nature a sovereign function, incapable of being performed by a private individual [and] . . . the welfare and education of its citizenry is . . . an area where sovereign activity is typically asserted").

Second, the *Weltover* and *Nelson* cases also instruct courts to avoid the artful pleading of plaintiffs and look to the core of the activities alleged to be commercial in nature. Thus, the Southern District of New York has explained that "*Nelson* rest[s] on a broader principle, directing district courts first to ascertain the claim's gravamen to determine whether the FSIA plaintiff is simply using creative nomenclature as a semantic ploy to shroud the true essence of its theory and obtain jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign." *Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah*, 184 F. Supp. 2d 277, 299 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). District courts have applied both limiting principles in instructive contexts.

Employing this principle, the District of Oregon has recently considered the commercial activity exception in circumstances similar to our own. In *Doe v. Holy See*, the district court of Oregon considered the applicability of the commercial activity exception to claims against the Holy See stemming from the alleged abuse of the plaintiff by his priest, a Holy See employee. 434 F. Supp. 2d at 937-47. After a lengthy analysis of the term "commercial activity" under the FSIA, the district court stated as follows:

> [T]he Supreme Court has counseled courts not to lose sight of the ultimate issue: whether the true essence of the complaint is commercial. *Nelson*, 507 U.S. at 363. Here, plaintiff's complaint does not allege property damage, breach of contract for goods or services, product liability, copyright infringement, an indebtedness yet unpaid on a loan or other transaction, or any other theory whose true essence is commercial. Instead, at the heart of plaintiff's complaint is the injury inflicted by a sexually abusive priest at plaintiff's church, a claim clearly sounding in tort.

*Id.* at 942. In other words, the *Doe* Court did not rely on the public-private inquiry, but instead it examined the "gravaman" of the claims advanced by the plaintiff. *See Leutwyler*, 184 F. Supp. 2d at 299. Regardless of how the plaintiff phrased his complaint, none of the allegations truly sounded in commercial activity, and thus the commercial activity exception did not apply. *Doe*, 434 F. Supp. 2d at 947.

Both limiting principles apply to plaintiffs' attempt to invoke the commercial activity exception in our own case. On one front, all of the claims advanced by plaintiffs stem from the promulgation of the purported 1962 Policy by the Holy See. Indeed, in arguing that the discretionary function exception did not apply, plaintiffs themselves emphasize the force of the purported policy and the potential for sanction if Holy See employees chose not to comply.

In addition, the gravaman of plaintiffs' claims is the tortious conduct of priests which was allegedly facilitated by the tortious conduct of Holy See employees. Thus to allow plaintiffs to obtain jurisdiction under the commercial activity exception through a semantic ploy would allow them to "obtain jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign." *See Leutwyler*, 184 F. Supp. 2d at 299. We therefore conclude that the commercial activity exception does not apply.

**b.      The Tortious Act Exception**

Pursuant to the FSIA, a plaintiff can establish subject matter jurisdiction over a foreign sovereign under the tortious act exception if there has been a tortious act (1) "occurring in the United States"; (2) "caused by [a] tortious act or omission"; (3) where the alleged acts or omissions were those of a "foreign state or of any official or employee of that foreign state"; and (4) those acts or omissions were done within the scope of tortfeasor's employment. *See* 28 U.S.C. § 1605(a)(5).

Because, however, there are exceptions to the tortious act exception, our inquiry does not end here. If the tortious act in question was either (1) "based upon the exercise or performance or

the failure to exercise or perform a discretionary function" or (2)"ar[o]s[e] out of . . . misrepresentation [or] deceit . . . " then the foreign sovereign retains its immunity.  28 U.S.C. § 1605(a)(5)(A), (B).

In determining whether the tortious act exception applies, courts, as a rule, apply state substantive law: "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 622 n.11 (1983); *see also Pescatore v. PAN AM*, 97 F.3d 1, 12 (2d Cir. 1996) (stating that "the FSIA thereby operates as a 'pass-through' to state law principles").  Thus, "[a]s a general rule, state law should provide a cause of action against a foreign nation in a section 1605(a)(7) claim [under the Tortious Act Exception]." *Damarrell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343, at \*55 (D.D.C. 2005). Therefore, to determine the applicability of the tortious act exception, we must consider the elements of the exception, applying Kentucky state law where applicable.[8]

### i.        Elements of the Tortious Act Exception

### (a)        "Occurring in the United States"

"Section 1605(a)(5) is limited by its terms . . . to those cases in which the damage to or loss of property occurs in the United States." *Amerada Hess Shipping Corp.*, 488 U.S. at 439 (emphasis omitted).  Thus, in contrast to the commercial activity exception, a tortious act having "direct effects" in the United States will not satisfy the requirements of the tortious activity exception. *Id*. at 441.  Courts in both the Second and D.C. Circuits have interpreted this requirement to mean that the "entire tort" must occur in the United States. *See, e.g.*, *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524-25 (D.C. Cir. 1984) (rejecting application of the tortious activity exception because "the entire tort would not have occurred [in the United States]"); *Kline v. Kaneko*, 685 F. Supp. 386, 391 (S.D.N.Y. 1988) ("If the non-commercial tort exception is to apply, the entire tort must be committed in the United States."); *see also Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks)*, 349 F. Supp. 2d 765, 795 (S.D.N.Y. 2005) (collecting Second Circuit cases).  *But see Olsen v. Gov't of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984) (abrogated on other grounds by *Joseph v. Office of Consulate Gen. of Nig.*, 830 F.2d 1018, 1026 (1987)) ("[I]f plaintiffs allege at least one entire tort occurring in the United States, they may claim under section 1605(a)(5).").

---

[8]As noted above, the class representatives all resided in the state of Kentucky at the time of the alleged abuse. "[I]n FSIA cases, we use the forum state's choice of law rules to resolve 'all issues,' except jurisdictional ones." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 85 (2d Cir. 2002).  According to Kentucky's choice of law rules, Kentucky law would apply where Kentucky is the state where the relevant acts or omissions occurred. *See, e.g.*, *Vaughn v. United States*, 1997 U.S. App. LEXIS 35795, at \*9 n.2 (6th Cir. Dec. 16, 1997) (applying Kentucky law in a case arising under the Federal Tort Claims Act).

However, the choice of law inquiry is complicated by the fact that the case before is us is a class action suit. Under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), due process requirements apply to nationwide class action lawsuits, requiring courts to engage in individualized choice of law analysis for each plaintiff's claims and not just named plaintiffs. *Id*. at 822-23.

But the individualized choice of law analysis is only necessary once the class seeks certification. While the class remains a putative class, courts focus on the application of the forum's choice of law rules to the named plaintiffs. *Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 883 (N.D. Iowa 1999) ("[I]t is important to note that at this point in the litigation, the Court has not certified the Plaintiffs as class representatives. Accordingly, the Court will not make a choice of law determination that will bind the putative class in this Order. This Order only contemplates the claims of the named Plaintiffs . . . ."); *cf. Rakes v. Life Investors Ins. Co. of Am.*, 2007 U.S. Dist. LEXIS 52719, at \*33 (N.D. Iowa July 20, 2007) ("[I]n the case at bar the court has not yet certified Plaintiffs as class representatives. Therefore, nothing in this order may be construed as a non-individualized choice-of-law determination that binds all 150,000 putative members of the Class.").  We, in the instant case, need not engage in such an individualized choice of law analysis because plaintiffs have not yet sought certification.

We join the Second and D.C. Circuits in concluding that in order to apply the tortious act exception, the "entire tort" must occur in the United States. This position finds support in the Supreme Court's decision in *Amerada Hess Shipping*: "the exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States." 488 U.S. at 441. Moreover, the purpose of the tortious activity exception is limited: "Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." *Id*. at 439-40 (citing H.R. Rep., at 14). Thus, it seems most in keeping with both Supreme Court precedent and the purposes of the FSIA to grant subject matter jurisdiction under the tortious activity exception only to torts which were entirely committed within the United States.

### (b)       Caused by an Act or Omission

In Kentucky, "[l]iability for a negligent act follows a finding of proximate or legal cause," which is defined as "a finding of causation in fact, i.e., substantial cause, and the absence of a public policy rule of law which prohibits the imposition of liability." *Deutsch v. Shein*, 597 S.W.2d 141, 143-44 (Ky. 1980). "In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . . The negligence must also be a substantial factor in bringing about the plaintiff's harm." *Id*. (quoting Restatement of Torts (Second) § 431, cmt. a).

### (c)       Official or Employee of a Foreign State

Kentucky law appears to have adopted the Restatement (Third) of Agency § 7.07 definition of employee when addressing claims of vicarious liability: "an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work . . . ." *Papa John's Int'l, Inc. v. McCoy*, 2008 Ky. LEXIS 16, at *16 (Ky. 2008) (quoting Restatement (Third) of Agency § 707).[9] In addition, "the fact that work is performed gratuitously does not relieve a principal of liability." *Id*.

### (d)       Scope of Employment

"State law, not federal common law, governs whether an officer's or employee's action is within the scope of employment in determining the applicability of the FSIA." *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 173 (5th Cir. 1994) (applying Mississippi law) (citing *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983)); *see also, e.g.*, *Doe*, 434 F. Supp. 2d at 944 (applying Oregon law); *Robinson v. Gov't of Malay.*, 269 F.3d 133, 145 (2d Cir. 2001) (applying New York law); *Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 326-27 (9th Cir. 1996) (applying California law). Because the conduct alleged by the named plaintiffs occurred in Kentucky, Kentucky law applies to the instant case.

---

[9]The Holy See contends that plaintiffs failed to identify specifically which clergy engaged in the relevant tortious conduct. As a result, the Holy See seizes upon the language in the complaint which names the "Louisville Corporation" as one of the agents of the Holy See having engaged in the tortious conduct; in turn, the Holy See argues that all of the allegations in the complaint can only be analyzed in terms of the actions of the Louisville Corporation. And, the Holy See believes that corporate law prevents holding it liable for the actions of another corporate entity. However, this analysis begins with a faulty premise. Plaintiffs pled repeatedly that the tortious acts of which they complain were also committed by priests, clerics, bishops, archbishops, cardinals, agents and employees. General allegations against employees are sufficient for the purposes of notice pleading: "a complaint that generally alleges an employer's negligence need not specifically identify each employee involved to hold the employer liable under respondeat superior." *Cornejo-Ramirez v. James G. Garcia, Inc.*, 2000 U.S. Dist. LEXIS 20064, at *13 (D. Ariz. 2000) (also noting "[t]he court is required to examine Plaintiffs' complaint under the standard set forth in Fed R. Civ. P. 8(f) that 'all pleading shall be so construed as to do substantial justice'").

Under Kentucky law, for alleged conduct to be considered within the scope of employment "the conduct must be of the same general nature as that authorized or incidental to the conduct authorized." *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000). Thus, "[u]nder the doctrine of respondeat superior, an employer can be held vicariously liable for an employee's tortious actions if committed in the scope of his or her employment." *Papa John's Int'l*, 2008 Ky. LEXIS 16, at *28-*29. "In the area of intentional torts, the focus is consistently on the purpose or motive of the employee in determining whether he or she was acting within the scope of employment." *Id.* at *29. However, "[a] principal is not liable under the doctrine of respondeat superior unless the intentional wrongs of the agent were calculated to advance the cause of the principal or were appropriate to the normal scope of the operator's employment." *Osborne*, 31 S.W.3d at 915. Applying these principles, the Kentucky Supreme Court ruled that a priest's adulterous conduct could not be considered within the scope of his employment, even though the underlying conduct was intentional. *Osborne*, 31 S.W.3d at 915.

### ii.        Exceptions to the Tortious Act Exception

### (a)        Discretionary Function Exception to the Tortious Act Exception

The FSIA does not define "discretionary functions." To interpret the FSIA's discretionary function exception, courts typically apply the interpretation of the discretionary function exception of the Federal Tort Claims Act (the "FTCA"), because "[n]ot only does the language of the FSIA discretionary function exception replicate that of the [FTCA], 28 U.S.C. § 2680(a), but the legislative history of the FSIA, in explaining section 1605(a)(5)(A), directs us to the FTCA." *Olsen*, 729 F.2d at 646 (citing H.R. Rep. at 21); *see also Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 8 (1st Cir. 2002); *Office of Consulate Gen. of Nig.*, 830 F.2d at 1026 (9th Cir. 1987).

In determining whether particular conduct falls under the FTCA's, and in turn under the FSIA's, discretionary function exception, courts apply the two part *Berkovitz* test:

> The first inquiry is whether the challenged action involved an element of choice or judgment, for it is clear that the exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." If choice or judgment is exercised, the second inquiry is whether that choice or judgment is of the type Congress intended to exclude from liability - that is, whether the choice or judgment was one involving social, economic or political policy.

*Vickers v. United States*, 228 F.3d 944, 949 (9th Cir. 2000) (internal citations omitted) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *Rodriguez*, 297 F.3d at 9 (applying the two-part *Berkovitz* test to the FSIA's discretionary function exception). The Supreme Court in *Berkovitz* explained the rationale behind the discretionary function exception:

> The basis for the discretionary function exception was Congress' desire to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy.

*Berkovitz*, 486 U.S. at 536-37 (internal quotation marks and citation omitted).

A number of courts have applied the *Berkovitz* test to cases of negligent hiring, concluding that the selection of employees, officials and officers typically falls within the scope of the FTCA's discretionary function exception. *See, e.g.*, *United States v. Gaubert*, 499 U.S. 315, 332-34 (1991) (finding that the negligent selection of directors and officers falls squarely under the FTCA's

discretionary function exception); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) ("The hiring, training, and supervision choices that [the defendant] faces are choices susceptible to policy judgment. The hiring decisions of a public entity require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition." (internal quotation marks and citation omitted)); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) ("The post office's choice between several potential employees involves the weighing of individual backgrounds, office diversity, experience and employer intuition. These multi-factored choices require the balancing of competing objectives, and are of the nature and quality that Congress intended to shield from tort liability." (internal quotation marks and citation omitted)); *cf. Carlyle v. United States, Dep't of Army*, 674 F.2d 554, 557 (6th Cir. 1982) ("Any decision to supervise [army recruits] only by means of letters and not to place personnel in the Hotel was a discretionary function and outside federal jurisdiction.").

### (b)     Arising Out of Misrepresentation or Deceit Exceptions to the Tortious Act Exception

The scope of the misrepresentation or deceit exception to the tortious act exception is an unsettled matter. Courts generally have looked to the definition of misrepresentation in the FTCA as a guide for defining the term under the FSIA, relying on the legislative history of the FSIA for such comparison. *See, e.g.*, *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 200 n.4 (2d Cir. 1999) ("The FSIA House Report provides that 'the exceptions provided in subparagraph[] . . . (B) of section 1605(a)(5) correspond to many of the claims with respect to which the U.S. Government retains immunity under the [FTCA], 28 U.S.C. 2680(a) and (h).") (quoting H.R. Rep. at 21); *see also De Sanchez v. Banco Central de Nicar.*, 770 F.2d 1385, 1398 (5th Cir. 1985).

In addition, both the Second and Ninth Circuits have dismissed claims against foreign sovereigns where the foreign sovereign allegedly provided false or misleading information regarding the whereabouts of the plaintiffs' relatives. *See Cabiri*, 165 F.3d 193, 200 (dismissing claim "for emotional injury caused by the refusal of a foreign state, however nefarious, to give its citizens in the United States full or truthful information concerning its operations"); *Kozorowski v. Russian Fed'n*, No. 93-16388, 1997 U.S. App. LEXIS 26266 (9th Cir. Sept. 19, 1997) (dismissing claims of intentional infliction of emotional distress, fraud and deceit, conspiracy and other claims because they were premised on the Soviet Union's failure to disclose its role in the 1940 massacre of Polish soldiers and therefore arose out of misrepresentation and deceit).

### iii.     Application of the Tortious Act Exception to the Instant Case

The difficulty in applying the elements of the tortious act exception to plaintiffs' complaint is the manner in which plaintiffs have pled their claims. In their complaint, plaintiffs advance the following claims: violation of customary international law of human rights, negligence, breach of fiduciary duty, tort of outrage/infliction of emotional distress, deceit and misrepresentation.[10] In each of their claims, plaintiffs base their theories of liability not only on the actions of the Holy See itself, but also on the acts of the Holy See's agents and employees. As a result, we must analyze each claim to see not only which claims survive, but which *parts* of each claim survive.

Looking first to the fourth requirement for the application of the tortious act exception, the Kentucky Supreme Court's holding in *Osborne*, 31 S.W.3d at 915, leads to the inescapable conclusion that the alleged acts of sexual abuse were not done while the alleged tortfeasors were acting within the scope of their employment. Thus, the tortious act exception to the FSIA's grant

---

[10]*See supra*, n.1.

of immunity cannot apply to permit suit against the Holy See for sexual abuse by its clergy, even if the other requirements for its application are met.

Furthermore, as per the FSIA's explicit terms, in order for the tortious act exception to apply, the tortious acts in question must have occurred in the United States. Therefore, any portion of plaintiffs' claims that relies upon acts committed by the Holy See abroad cannot survive. For example, the tortious act exception to the FSIA's grant of immunity would not include any theory of liability premised on the Holy See's own negligent supervision because such acts presumably occurred abroad; moreover, a direct claim leveled against the Holy See for promulgating the 1962 Policy would not fall within the tortious act exception because it too presumably occurred abroad. In turn, plaintiffs cannot pursue claims based upon the alleged sexual abuse of priests or based upon the acts of the Holy See that occurred abroad.[11]

These conclusions are not wholly dispositive, however, of the claims against the Holy See. As noted before, plaintiffs' claims are not based solely on the conduct of the Holy See itself or the allegedly abusive conduct of priests. All of plaintiffs' claims also advance theories of liability premised on the conduct of Holy See employees in the United States engaged in the supervision of the allegedly abusive priests. These portions of plaintiffs' claims meet the four requirements for application of the tortious act exception.

First and contrary to the Holy See's protestations, plaintiffs have pled both that the relevant archbishops, bishops and other Holy See personnel had knowledge of the alleged sexual abuse of priests and that they failed to act on that knowledge. In doing so, it would seem that the complaint also pleads that conduct of the archbishops, bishops and other Holy See personnel were a substantial factor in causing plaintiffs' damages, satisfying Kentucky's causation requirements.

In addition, and as already noted, tortious acts committed by bishops, archbishops and other Holy See personnel while engaged in the supervision of allegedly abusive priests satisfy the requirements of the FSIA's tortious act exception that the tortious act occur in the United States and within the scope of employment.

Also, for the conduct of bishops and archbishops and other Holy See personnel to serve as a basis for jurisdiction under the tortious act exception, these bishops, archbishops and Holy See personnel must have been employees of the Holy See. As noted above, under Kentucky law, this inquiry focuses on the degree of control exercised by the employer over the individual or individuals in question. In their complaint, plaintiffs allege facts that demonstrate that the Holy See exercised a significant degree of control over the bishops and archbishops accused of having committed the tortious acts in question. Taking these allegations as true, plaintiffs have sufficiently pled the employee element of the tortious activity exception.[12]

Thus, the portions of plaintiffs' claims that are based upon the conduct of bishops, archbishops and Holy See personnel while supervising allegedly abusive clergy satisfy all four requirements of the tortious act exception: this conduct served as a substantial cause of the alleged

---

[11] Plaintiffs appear to have agreed with these applications of the tortious act exception: "The Plaintiffs do not seek to hold the Defendant vicariously liable for the acts of its priests; rather, they seek to hold the Defendant vicariously liable for the acts of its bishops and archbishops who, following the directives of the Defendant, permitted childhood sexual abuse to occur." Indeed, the alleged torts committed by the bishops and archbishops occurred entirely within the United States. Moreover, complying with the alleged 1962 Policy would fall within the scope of the bishops' and archbishops' employment.

[12] As noted above, the district court also correctly employed the FSIA burden-shifting analysis in connection with this inquiry.

abuse; the conduct occurred in the United States; the conduct was within the scope of employment; and these individuals were, according to the pleadings, Holy See employees.

However, although the four requirements are met for these claims, we must still consider whether either of the two exceptions to the tortious act exception applies and prevents its application: the discretionary-function exception and the arising-out-of-misrepresentation-or-deceit exception.

According to the allegations in plaintiffs' complaint, theories of liability premised upon the supervision of the allegedly abusive clergy do not implicate the discretionary function exception to the tortious act exception because the terms of the supervision were not discretionary.  According to the complaint, the 1962 Policy "impose[d] the highest level of secrecy on the handling of clergy sexual abuse matters."  Plaintiffs contend that this required secrecy prohibited Holy See personnel from, among other things, reporting childhood sexual abuse to government authorities.  *Id.*  Thus, following the 1962 Policy cannot, on the pleadings in plaintiffs' complaint, be deemed discretionary. We now apply these general conclusions to each of the plaintiffs' remaining claims.[13]

1)      **Violation of Customary International Law of Human Rights** (Class I Claim II, Class II Claim I): Plaintiffs plead this claim against the Holy See itself, stating that

> [t]he instructions, mandates and dictates of the Defendant, Holy See in the United States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators under its control, thereby placing children in a position of peril, is a gross violation of well-established, universally recognized norms of international law of human rights.

This claim does not survive against the Holy See as it pertains to the actual promulgation of the 1962 Policy because the promulgation itself occurred abroad.  However, this claim does survive against the Holy See as it pertains to the conduct of its employees who, pursuant to the 1962 Policy, violated the terms of the relevant international laws through their tortious supervisory conduct over the allegedly abusive clergy.

2)      **Negligence** (Class I Claim III, Class II Claim II):  Plaintiffs present three grounds for negligence in their complaint: failure to provide "safe care"; failure to "warn"; and failure to report. The failure to warn and failure to report prongs of the negligence claim survive because they are premised on the conduct of Holy See employees who were allegedly negligent in their supervision of abusive clergy.  However, the claims of negligence against the Holy See for its own conduct cannot survive because such negligence would not have occurred in the United States.  Furthermore, the claim of failure to provide safe care does not survive.  As the district court noted, the failure to provide safe care amounts to a claim for negligent hiring.  *O'Bryan II*, 471 F. Supp 2d at 793.  And, as outlined above, claims of negligent hiring fall within the discretionary function exception. Indeed, the 1962 Policy, even according to plaintiffs' allegations, only required Holy See employees not to disclose information regarding sexual misconduct, not to actually hire individuals who had engaged in prior sexual misconduct.

3)      **Breach of Fiduciary Duty** (Class I Claim IV, Class II Claim III): Plaintiffs plead this claim against the Holy See itself, stating that "a special legal relationship existed between the Plaintiffs and the Defendant Holy See, in the nature of a fiduciary relationship, which was carried out by and through priests, clerics, and administrators under the absolute control of the Defendant . . . ."  In turn, plaintiffs contend that the "Defendant breached fiduciary duties owed to the Plaintiffs,"

---

[13]*See supra* n.1.

premised upon the "duty to warn parents" and the "duty to report known or suspected perpetrators." This claim survives against the Holy See for the actions of its supervising employees occurring in the United States. As has already been emphasized, the claim cannot survive against the Holy See itself for its own failures to warn or report because such tortious conduct would have occurred abroad.

4)    **Tort of Outrage/Infliction of Emotional Distress** (Class I Claim V, Class II Claim IV): Plaintiffs plead this claim against the Holy See itself, stating:

> The acts and omissions of the Defendant, Holy See alleged herein, including the concealment of its policy of harboring and protecting its abusive priests, agents and employees from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to authorities . . . is conduct which is so outrageous and extreme in degree, as to go beyond all possible bounds of decency, so as to be regarded as utterly atrocious in a civilized society.

This claim cannot survive against the Holy See as it pertains to the actual promulgation of the 1962 Policy because the promulgation itself occurred abroad. In addition, it cannot survive against the Holy See for the conduct of its allegedly abusive priests because the acts of alleged abuse did not occur within the scope of employment. In contrast, this claim does survive against the Holy See as it pertains to the conduct of its employees who, pursuant to the 1962 Policy, violated the terms of the relevant international laws through their tortious supervisory conduct over the allegedly abusive clergy.[14]

We next turn to considering whether the surviving theories of liability, as outlined above, are precluded by the other exception to the tortious act exception: whether they arise out of misrepresentation or deceit.

In contrast to *Cabiri* and *Kozorowski*, plaintiffs' claims are not best characterized as stemming directly from the misinformation disseminated by the Holy See. Instead, plaintiffs' claims are more akin to claims of negligent supervision as employees of the Holy See are alleged to have provided inadequate supervision over those under its care. In this way, these claims resemble other negligent supervision claims more than they resemble claims brought by the plaintiffs in *Cabiri* and *Kozorowski. See, e.g.*, *Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 148 (Ky. 2003) (addressing claims of negligent supervision on the part of high school faculty which resulted in the death of a student and noting that "[i]t is well established in this jurisdiction that a school teacher can be held liable for injuries caused by negligent supervision of his/her students"); *see also Yanero v. Davis*, 65 S.W.3d 510, 528-31 (Ky. 2001); *Nelson v. Turner*, No. 2007-CA–000489-MR, 2008 Ky. App. LEXIS 177 (Ky. Ct. App. June 6, 2008). We therefore conclude that, at this stage of the litigation, the plaintiffs' claims of violation of customary international law of human rights, negligence, and breach of fiduciary duty should not be dismissed for "arising out of . . . misrepresentation [or] deceit." *See* 28 U.S.C. § 1605(a)(5)(B). We do however dismiss the last two claims advanced by plaintiffs in their complaint (Class I Claims VI and VII, Class II Claims V and VI) as they do arise out of misrepresentation or deceit.[15]

---

[14] It also appears that the plaintiffs have abandoned this claim by stating in their response to the Holy See's motion to dismiss "[t]he Plaintiffs' complaint also identifies claims for intentional infliction of emotional distress . . . . Plaintiffs are no longer pursuing those claims." (Plaintiffs' Response to the Holy See's Motion to Dismiss at 6 n.9).

[15] In addition, plaintiffs' complaint states that it pursues these claims against the Holy See "in its capacity as an Unincorporated Association and Head of an International Religious Organization Only." As a result, because we have determined above that the Holy See cannot be sued in such a capacity, these claims would appear to no longer be relevant. Moreover, plaintiffs admit as much in their Response to the Holy See's motion to dismiss. Plaintiffs' Response

In conclusion, we also note that we believe the foregoing analysis to be consistent with the analysis of the district court in *O'Bryan II*.

VII.

For the foregoing reasons, we affirm the district court's partial grant of defendant's motion to dismiss.

---

to the Holy See's Motion to Dismiss at 6 n.9 (stating that "the complaint alleges claims for deceit . . . and misrepresentation . . . . Those latter causes of action were expressly brought against the Defendant only in its capacity as an unincorporated association and head of an international religious organization.  In light of the [district] Court's previous ruling that such capacity does not apply here, those claims are no longer at issue).